**R.A. BARTON, et al., Plaintiffs,**

v.

**AMERICAN RED CROSS,
et al., Defendants.**

**Civ. A. No. 91–T–1001–S.**

United States District Court,
M.D. Alabama, S.D.

July 9, 1993.

James Prestwood, Andalusia, AL, Alvin Prestwood, Linda G. Smith, Joseph Borg, Ben Fuller, Montgomery, AL, for plaintiffs.

Kathryn H. Sumrall, Birmingham, AL, for movant/intervenor.

Tony Miller, Jeffrey Grantham, Warren B. Lightfoot, Birmingham, AL, Bruce Chadwick, Deena R. Bernstein, Kathleen Behan, David P. Gersch, Washington, DC, for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiffs, R.A. Barton and her husband and two sons, have brought this lawsuit claiming that defendants, the American Red Cross and Eoline McGowan, M.D., negligently and wantonly failed to screen properly for HIV-infected blood that was given to Mrs. Barton in a transfusion. The Bartons rest their claim on the Alabama Medical Liability Act (AMLA), Ala.Code 1975 §§ 6-5-480 to -488, 6-5-540 to -552. The Bartons also charge the defendants with fraudulently suppressing for six months the knowledge that the blood donor had tested HIV-positive on a subsequent donation. In addition, the Bartons charge the defendants with the tort of outrageous conduct for failing to disclose the donor's HIV-positive status. The Red Cross and Dr. McGowan, who was the medical director for the Red Cross in Alabama at the time of Mrs. Barton's transfusion, move for summary judgment on all of the Bartons' claims. Dr. McGowan also moves to dismiss all claims against her based on official immunity, or in the alternative, to strike the Bartons' jury demand and claims for punitive damages against her.[1] For the reasons set forth below, the Red Cross's and Dr. McGowan's motions for summary judgment

are granted and Dr. McGowan's motion to dismiss is denied in part and granted in part.

## I. MOTIONS FOR SUMMARY JUDGMENT

As stated, the Red Cross and Dr. McGowan contend that they are entitled to summary judgment on all claims. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A district court must consider "all the evidence in the light most favorable to the non-moving party ... and resolve all reasonable doubts in favor of the non-moving party." *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990) (citations omitted).

### A. Background

In June 1988, a 25-year-old female donated blood to the Red Cross. She completed a medical history questionnaire and was given a brief examination. The donor read a pamphlet describing individuals who were considered to be at high risk of getting AIDS and she indicated in writing that she understood the pamphlet. She also indicated that she was not in any high risk group. After collecting the donor's blood, the Red Cross tested it for HIV using an initial screening test known as an "ELISA" test, and the blood tested negative. The blood was sent out for use in transfusions even though it is possible for the presence of HIV not to appear in a blood test if the donor is tested within a six month "window period" of being infected with HIV. In July 1988, the Southeast Alabama Medical Center in Dothan, Alabama admitted Mrs. Barton for treatment by Dr. John P. Moore, Jr. The hospital gave Mrs. Barton a transfusion with the blood taken from the donor provided by the Red Cross. The Red Cross kept a record of which hospital had received the blood but received no information as to the identity of the ultimate recipient.

---

1. Pursuant to 36 U.S.C.A. § 2, the federal courts have original jurisdiction over all cases to which the Red Cross is a party. *See American National*

*Red Cross v. S.G.*, —— U.S. ——, ——, 112 S.Ct. 2465, 2472, 120 L.Ed.2d 201 (1992).

In June 1990, the same donor again gave blood to the Red Cross. On June 9, the Red Cross tested the donor's blood using the initial ELISA test. The blood tested positive for HIV. The Red Cross sent the blood to another laboratory for a confirmatory test and received the results, which were positive, in August 1990. Subsequently, the Red Cross conducted a "look-back" to determine whether the donor had previously given blood and, if so, to identify the recipient hospital. It is unclear when the Red Cross began this procedure. After the Red Cross ultimately conducted the look-back, it notified the Medical Center of the donor's HIV status on December 13, 1990.

On January 3, 1991, Dr. Moore passed the information on to Mrs. Barton, who took an HIV test. In January, Mrs. Barton learned that the results of her initial test and confirmatory test were positive, though the parties dispute the exact date on which she was informed of her confirmatory test results. In July 1991, Mrs. Barton filed this lawsuit against the Red Cross and Dr. McGowan, who was the medical director for the Red Cross in Alabama at the time of Mrs. Barton's transfusion; she claimed that these two defendants were negligent and wanton in screening the donor's blood.[2] She amended her complaint to add claims for loss of consortium by her husband and loss of services by her sons.

In February or March 1992, the Bartons learned for the first time of the Red Cross's delay in informing Mrs. Barton of the blood donor's HIV-positive status. The Bartons amended their complaint to add claims of fraudulent suppression and the tort of outrage based on the delay.

### B. Standard of Care

■ As the court has previously found, the Bartons' negligence claims are governed by the AMLA. *Barton v. American Red Cross (Barton I)*, 804 F.Supp. 1455, 1457 (M.D.Ala.1992); *cf. Bradway v. American National Red Cross*, 992 F.2d 298, 300 (11th Cir.1993) (under Georgia law, action against Red Cross for negligent collection and supply of blood is governed by Georgia medical malpractice law). The AMLA provides that the "standard of care is that level of such reasonable care, skill and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases." Ala.Code 1975 § 6–5–542(2). With this standard, the AMLA "establish[es] a *relative standard of care* for health care providers." § 6–5–548(e) (emphasis added). Thus, the Bartons must show that the actions of the Red Cross and Dr. McGowan were not in accordance with those of similarly situated blood collectors at the time of the challenged actions.

The Bartons contend that simply meeting a relative standard of care—that is, the level of care exercised by other health care providers—is insufficient when reasonable prudence dictates that stricter requirements should be met, even if no other health care providers meet those requirements. In support of their contention, however, the Bartons erroneously rely on negligence cases that are not based on the AMLA. *See, e.g., The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). Their contention is also contrary to the language of the AMLA and Alabama case law. The Alabama Supreme Court, in construing the 1975 version of the AMLA, held that the "legal duty imposed upon physicians is to exercise the degree of reasonable care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances." *Bates v. Meyer*, 565 So.2d 134, 136 (Ala.1990). Although the later, 1987 supplementary version of the AMLA, under which the Bartons bring their claims, has a new standard-of-care provision, § 6–5–542(2), the language is almost identical to the standard-of-care provision in § 6–5–484(a) of the 1975 version. The Bartons have not shown that the new provision altered the previous requirement that the standard of care be measured against that of the national medical community. In fact, the Alabama Supreme Court has continued to cite with approval

---

2. Dr. Moore and the Southeast Alabama Medical Center were also named as defendants but were later dismissed. *Barton v. American Red Cross (Barton II)*, 826 F.Supp. 407 (M.D.Ala.1993).

cases construing the standard of care under the 1975 version. *See, e.g., Brooks v. Goldhammer,* 608 So.2d 394, 395 (Ala.1992) (citing *Bates* ).

■ The Bartons argue that interpreting § 6–5–542(2) as requiring only a relative standard of care "would subject the section to severe constitutional attacks" under both the federal and Alabama constitutions but fail to assert that the statute is in fact unconstitutional. Nevertheless, the court will briefly address the Bartons' apparent constitutional contentions. The Bartons contend that § 6–5–542(2) violates the equal protection clause of the fourteenth amendment to the United States Constitution and the equal protection provisions of the Alabama Constitution of 1901, §§ 1, 6, and 22 of Article I. In *Plitt v. Griggs,* 585 So.2d 1317, 1324–25 (Ala.1991), the Alabama Supreme Court rejected a similar attack on the constitutionality of § 6–5–548, which sets out the burden of proof and defines who is a "similarly situated health care provider" within § 6–5–542(2)'s definition of the standard of care. Like the Bartons, the plaintiff in *Plitt* argued that, because the provisions of § 6–5–548 apply only to medical malpractice actions, the statute imposes a restriction on medical malpractice plaintiffs not imposed on other types of plaintiffs. *Id.* at 1324.

■ A statute, such as the AMLA's relative standard provision, that does not interfere with a fundamental right or discriminate against a suspect class will ordinarily survive an equal protection attack based on the federal constitution so long as the challenged classification is rationally related to a legitimate governmental purpose. *See, e.g., Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988). Applying the rational basis test to the equal protection challenge under the federal constitution, the court in *Plitt* found that § 6–5–548's establishment of a relative standard of care for health care providers is rationally related to a proper governmental purpose. 585 So.2d at 1324. Because this court agrees with *Plitt*'s analysis of § 6–5–548 and because §§ 6–5–548 and 6–5–542(2) serve the same end, it follows that the provisions in § 6–5–542(2) are also ra-

tionally related to a proper governmental purpose. In addition, the Alabama Supreme Court held that its analysis of the equal protection issue under the federal constitution was equally applicable to the state constitution. *Id.* at 1325. Thus, the Bartons' equal protection claims under both federal and state law are without merit.

■ The Bartons also argue that § 6–5–542(2) violates § 13 of Article I of the state constitution because it is an unreasonable, arbitrary, and oppressive modification of a fundamental right. The Bartons, however, have failed to identify what fundamental right the statute modifies or how the statute is unreasonable in light of the Alabama Supreme Court's finding that the establishment of a relative standard of care is rationally related to a proper governmental purpose. Relying on *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and *United States of Dep't of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973), the Bartons assert that § 6–5–542(2) constitutes an "irrational irrebuttable presumption" in violation of the due process clause of the fourteenth amendment to the United States Constitution. While the Bartons do not define what presumption is irrebuttable, the court assumes that the Bartons are claiming that the statute prevents them from establishing their claim using an ordinary standard of care. However, reasonable restraints on how a party may establish its civil claim and marshal its evidence in support of that claim, in the manner that § 6–5–542(2) seeks to do, are not condemnable as constitutionally impermissible irrebuttable presumptions. Finally, the Bartons suggest that the statute is subject to a vagueness challenge but they fail to explain how a relative standard of care is any more vague than the standard of care in a negligence case not brought under the AMLA. Section 6–5–542(2) is not unconstitutionally vague. Accordingly, the court finds that all of the Bartons' constitutional challenges to § 6–5–542(2) are meritless.

### C. Expert Testimony Requirement

■ The Red Cross and Dr. McGowan contend that they are entitled to summary

judgment because the Bartons have failed to satisfy the AMLA's requirements regarding expert testimony. Subsection (e) to § 6–5–548 of the AMLA provides that "A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he is a 'similarly situated health care provider.'" The Bartons contend, however, that whether a witness is competent to testify in a federal trial is a procedural issue controlled by federal rather than state law and that therefore subsection (e) does not apply in this lawsuit. According to the Bartons, Rule 702 of the Federal Rules of Evidence, which provides the standard for the admission of expert testimony in general, should apply. The Bartons are incorrect.

Rule 601 of the Federal Rules of Evidence provides that, "in civil actions and proceedings, with respect to an element of a claim or a defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law." This proviso means, in general, that state law governs the competency of a witness where the proof is directed at a substantive issue governed by state law. Charles A. Wright and Victor J. Gold, 27 Federal Practice and Procedure § 6007 at 78–79 (1990); James Wm. Moore and Helen I. Bendix, 10 Moore's Federal Practice § 601.06 at VI–22 (2d ed. 1993). Because Alabama supplies the rule of decision or substantive law for the issues now before this court—that is, whether the Red Cross and Dr. McGowan are liable for medical malpractice—Alabama law also governs the competency of witnesses to testify as experts regarding those issues. Admittedly, the jurisdictional basis for this litigation is a federal law governing the operation of the Red Cross, 36 U.S.C.A. §§ 1, et seq. *See American National Red Cross v. S.G.,* —— U.S. ——, ——, 112 S.Ct. 2465, 2472, 120 L.Ed.2d 201 (1992). However, the focus of Rule 601 is not on the basis for federal jurisdiction but rather on the source of the applicable substantive law. Federal Practice and Procedure § 6007 at 72–76; Moore's Federal Practice § 601.06 at VI–22. Here, because that source is state law—that is, the AMLA—the state's companion laws governing competency apply as well. Section 6–5–548, the AMLA's provisions governing expert witnesses, therefore applies to this federal lawsuit. *See Ralph v. Nagy,* 749 F.Supp. 169, 172–73 (M.D.Tenn.1990) (under Rule 601, Tennessee statute requiring medical expert witness in medical malpractice case to be licensed in Tennessee applied rather than Fed.R.Evid. 702), *aff'd on other grounds,* 950 F.2d 326 (6th Cir.1991); *Crumley v. Memorial Hospital, Inc.,* 509 F.Supp. 531, 532 n. 2 (E.D.Tenn.1978), *aff'd,* 647 F.2d 164 (6th Cir. 1981) (same); *Denton v. United States,* 731 F.Supp. 1034, 1036 (D.Kan.1990) (applying Kansas expert witness statute under Rule 601 rather than Rule 702).

As stated, subsection (e) to § 6–5–548 provides that a health care provider may testify as an expert witness in litigation against another health care provider only if the witness is a "similarly situated health care provider." The critical question then is when can a witness be considered a "similarly situated health care provider." Subsection (c) to § 6–5–548 offers one scenario: if the defendant health care provider holds himself or herself out as a specialist, is "certified by an appropriate American board as a specialist," and "is trained and experienced in a medical specialty," then a witness would be considered similarly situated, and thus competent to offer medical testimony, only if he or she is "certified by an appropriate American board in the same specialty" as the defendant and has "practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."[3]

---

**3.** Subsection (c) to § 6–5–548 provides in full:

"If the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similarly situated health care provider' is one who:

(1) Is licensed by the appropriate regulatory board or agency of this or some other state; and

(2) Is trained and experienced in the same specialty; and

■ Dr. McGowan is certified by the American Board of Pathology in Anatomical and Clinic Pathology and Blood Banking, is trained and experienced in the specialty of blood banking, and holds herself out as a specialist in blood banking. The Bartons' expert witness, Dr. Irving R. Schwartz, is certified in internal medicine rather than in blood banking.[4] In addition, Dr. Schwartz has been director of outpatient blood services at a medical center since 1986, but was not involved in the collection of blood in that position other than collecting patients' own blood for later transfusion into the patients themselves. Dr. Schwartz had previously been the director of the medical center's blood bank laboratory but left that position in 1986. Thus, as to Dr. McGowan, Dr. Schwartz does not meet the requirements of a "similarly situated health care provider" under subsection (c) to § 6–5–548. He is not certified in the same specialty as Dr. McGowan and did not practice in the specialty of blood collection and processing in the year preceding 1988 through 1991, the dates of the alleged negligent and wanton acts.

■ The Red Cross similarly contends that Dr. Schwartz does not qualify as a "similarly situated health care provider" under subsection (c). The Bartons maintain that subsection (c) does not apply to the Red Cross because it is impossible for an entity to be board certified. Instead, the Bartons argue that subsection (b) to § 6–5–548 applies. Under subsection (b), if the defendant is not board certified as a specialist or is not trained and experienced in a medical special-

ty, a witness may offer expert testimony only if he or she is "trained and experienced in the same discipline or school of practice" as the defendant and has "practiced in the same discipline or school of practice" during the year prior to the alleged negligent act.[5]

Relying on *Wilson v. American Red Cross,* 600 So.2d 216, 218–219 (Ala.1992), the Red Cross responds that the Alabama Supreme Court has already held that the Red Cross, acting through its physicians, should be treated as a "professional" under the AMLA. *Wilson,* however, did not address whether subsection (b) or (c) of § 6–5–548 applied to the Red Cross. Simply because the Red Cross is a "professional" does not mean that it is the equivalent of being board certified in a specialty. Furthermore, the Red Cross's physicians are presumably board certified in a number of different specialties. It is doubtful that the Alabama legislature intended that a plaintiff would be required to provide an expert who is board certified in all of the specialties covered by Red Cross physicians.

Nevertheless, the AMLA is clear in its application to non-individuals such as the Red Cross, and the Alabama Supreme Court so held in *Wilson.* Sections 6–5–481 and 6–5–542 provide that the "health care providers" covered by the AMLA include "medical institutions" and "professional corporations." The AMLA is not so clear, however, as to how § 6–5–548, the provisions governing expert witnesses, should be applied when the defendant is a non-individual. A common

---

(3) Is certified by an appropriate American board in the same specialty; and

(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."

Although the opening paragraph of § 6–5–548(c) uses the disjunctive "or" in describing the type of defendant covered by the section, the Alabama Supreme Court has interpreted the "or" as "and"; thus, for § 6–5–548(c) to apply, the defendant must meet all the requirements of the opening paragraph. *Medlin v. Crosby,* 583 So.2d 1290, 1294–96 (Ala.1991).

4. The Red Cross does not dispute that Dr. Schwartz meets § 6–5–548(c)(1)'s general licensing requirement. Dr. Schwartz is licensed by the State of Pennsylvania as a physician.

5. Subsection (b) to § 6–5–548 provides in full:

"If the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a 'similarly situated health care provider' is one who:

(1) Is licensed by the appropriate regulatory board or agency of this or some other state; and

(2) Is trained and experienced in the same discipline or school of practice; and

(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."

sense review of § 6–5–548 leads to, at least, one reasonable application.

Subsections (b) and (c), when read in conjunction with subsection (e), limit admissible expert testimony to those witnesses who are "similarly situated" to the defendant health care provider whose actions are being challenged. In setting the criteria for determining whether the witness and the defendant are similarly situated, the two subsections speak as if both the witness and the defendant are individuals, that is, persons. Subsection (c) provides that, if the defendant health care provider is a specialist, then both the defendant and the witness must have similar certification and similar specialty training and recent practical experience; and subsection (b) provides that, if the defendant is not a specialist, then both the defendant and the witness must have similar non-specialty training and recent practical experience. This approach makes sense because only individuals can testify as witnesses and because non-individuals such as the Red Cross can act only through individuals in rendering medical services.

Therefore, in applying subsections (b) and (c) to those instances where the defendant is a non-individual, such as a professional corporation or a medical institution, which has acted through another individual health care provider, the focus should be on the individual practitioner whose specific action allegedly fell below the required standard of care. In other words, where the defendant is a non-individual who has acted through an individual health care provider, subsections (b) and (c) would seem to limit admissible expert testimony to those witnesses who are "similarly situated" to the specific individual practitioner whose action formed the basis for the litigation against the non-individual defendant. Indeed, in *Leonard v. Providence Hospital,* 590 So.2d 906, 908 (Ala.1991), the Alabama Supreme Court appears to have assumed this point in applying the same expert witness requirements for hospitals as for individual health care providers. *See also Wozny v. Godsil,* 474 So.2d 1078, 1079 & n. 1, 1087 (Ala.1985) (defendant hospital's liability arose solely because an individual health care provider's negligence was imputed to the hospital due to the individual's association with the hospital; the expert witness requirements applicable to the individual applied to the hospital).

■ However, in this case, as the court explains below, the Bartons have not shown that Dr. McGowan was responsible for the alleged negligence and the Red Cross claims that it has no record of who performed the allegedly negligent services. Thus, the court does not have before it an identifiable individual health care provider through which the Red Cross acted. This does not mean, however, that § 6–5–548 cannot be applied. Where the non-individual defendant has acted through an individual who is not specifically identified, then the focus, obviously, cannot be on the individual. Instead, the court must, to the extent possible, anthropomorphize the non-individual defendant in order to determine whether the witness is sufficiently similarly situated under subsections (b) and (c) to be competent to offer expert testimony. The court may do this by determining from the challenged conduct what type of individual health care provider would be rendering similar services.

■ It is apparent that the Red Cross's alleged negligence concerned the rendering of services in the area of blood banking, including blood collection, processing and distribution. Therefore, only a witness competent in this area by training and recent experience should be allowed to testify under § 6–5–548. Subsection (b) rather than Subsection (c) would apply because there is nothing in the record that shows that only a certified specialist could render such services.

The Bartons contend that Dr. Schwartz's position as a director of outpatient blood services, which involves transfusions to patients of his hospital, and his position on the Medical Advisory Committee for the Red Cross in his region qualify him as having experience and training in the same discipline as the Red Cross. In determining whether § 6–5–548's "similarly situated" criteria have been met, a court should not apply the section mechanistically but rather prac-

tically and with common sense.[6] A practical application of § 6–5–548 would dictate that, if, through training and recent experience, a witness has obtained expertise in a discipline but only in a narrow area of the discipline and not in the discipline in general, then the witness should not be competent to testify regarding matters outside that narrow area. Here, Dr. Schwartz has some experience and training in certain aspects of blood banking but not in the specific area of blood collection, processing, and distribution involved in this litigation. The court therefore concludes that Dr. Schwartz does not qualify as a similarly situated health care provider.

▓▓▓▓ The Bartons argue that, even if Dr. Schwartz does not qualify as an expert, expert testimony is not required to prove malpractice in this case because the malpractice was obvious to a layperson. Under Alabama law, the general rule in medical malpractice cases is that expert medical testimony is required to establish proper medical procedure. *Plitt*, 585 So.2d at 1325. An exception to this general rule has been made for cases in which an understanding of the doctor's lack of due care or skill requires only common knowledge or experience. *Id.* Whether the Red Cross's blood testing and donor screening procedures met the standard of care, however, is not an issue that falls within this exception.

In conclusion, because Dr. Schwartz's testimony is not competent and because the Bartons have failed to submit other admissible expert testimony, both the Red Cross and Dr. McGowan are entitled to summary judgment. Nevertheless, in order to provide a complete record and because, as is shown below, the Red Cross and Dr. McGowan would still be entitled to summary judgment even if Dr. Schwartz qualified as an expert, the court will evaluate the Bartons' claims on their merits as if Dr. Schwartz qualified as an expert. The court will refer to Dr.

Schwartz as an "expert" for the sake of convenience.

### D. The Red Cross

The Bartons claim that the Red Cross has violated the statutorily required standard of care in two ways: by failing to provide adequate donor screening questions and advice and by failing to retest blood. The Bartons also charge the Red Cross with fraudulently suppressing for six months the knowledge that the blood donor had tested HIV-positive on a subsequent donation. Finally, the Bartons charge the Red Cross with the tort of outrageous conduct for failing to disclose the donor's HIV-positive status.

#### i. Donor Screening Questions and Advice

▓▓▓▓ The Bartons contend that the Red Cross violated the required medical standard of care by failing to advise prospective blood donors that, if they have been heterosexually promiscuous, they are at risk of having AIDS and should not give blood. Similarly, the Bartons argue that, as part of donor health history screening, the two defendants should have asked prospective donors if they have been heterosexually promiscuous. In addition, the Bartons argue that the Red Cross should have advised donors that they are at risk if they have been the sexual partner of a person who is heterosexually promiscuous. The Bartons maintain that these questions are especially important for heterosexual female donors because females are several times more likely to contract the HIV virus from a male partner than a male would be to contract the virus from a female partner. The donor whose blood was given to Mrs. Barton is female.

Despite these contentions, the Bartons have not presented sufficient evidence that the failure to ask these questions violated the standard of care of blood collectors in 1988. The Bartons' expert, Dr. Schwartz, could only say that such questions are "desirable" and that "there might be a few people ... who would exclude themselves under that line" of questioning. Dr. Schwartz also stated that it is "conceivable that asking that question may have affected the outcome in this particular case" but that he could not

---

6. *Cf. Wozny,* 474 So.2d at 1087 (even if the defendant and the witness are of different schools of practice and thus are not "in the same general line of practice" as required by § 6–5–484 of the 1975 version of the AMLA, "the witness may nevertheless be competent to testify on those standards as to which the principles of the schools do or should concur").

"go further than that." As to the standard of care, which determines the Red Cross's liability here, Dr. Schwartz conceded that "there's also a limit in terms of thinking up more and more questions to ask about dangerous behavior, and one would have to be guided by the blood banking community at the time, which listed these particular factors [in the Red Cross questionnaire]." Moreover, in response to a query whether the failure to ask the questions concerning heterosexual promiscuity violated the standard of care, Dr. Schwartz stated, "I can't give that opinion since no such standard existed at the time." He admitted that no one in the blood banking community asked donors about heterosexual promiscuity in 1988 and that the questions are still not asked today.

The Bartons point to the testimony of Dr. J. Jeffrey McCullough, the Red Cross official who was in charge of blood services in 1991. Dr. McCullough testified that the Red Cross should caution a female donor who "went home with a different man every night" that she may be at risk of contracting HIV. He did not testify, however, that the Red Cross violated the appropriate standard of care by not including that warning or that other blood collectors included that warning. Similarly, Dr. McGowan testified that it would not be inappropriate to ask female donors about sexual activities with males but she did not say that failing to ask the question would violate the standard of care.

In contrast, Dr. Paul V. Holland, the Chairman of the Standards Committee of the American Association of Blood Banks, testified that heterosexual promiscuity has never been a high risk category for AIDS as defined by the Public Health Service and that, even today, blood collectors do not ask questions about heterosexual promiscuity. Dr. Holland also stated that no governmental body or professional organization has ever advocated excluding promiscuous heterosexual individuals from being donors.

### ii. Failure to Retest Blood

The Bartons argue that the Red Cross violated the applicable standard of care in its testing of the donor's blood. In order to understand the Bartons' claims, it is necessary to explain the Red Cross's testing process. After the Red Cross receives blood donations, it takes a sample of each donor's blood and places it in a separate test tube for each donor. The Red Cross then tests the blood of numerous donors at the same time by putting a batch of test tubes in the same rack. A separate test kit is used for each batch of blood. Test tubes containing blood that is being tested for the first time are often tested in the same batch as test tubes containing blood that has already been tested once but is being retested.

The test used by the Red Cross is designed to be overly sensitive and to result in false positives. Therefore, the Red Cross routinely retests blood that has initially tested positive while it usually does not retest blood that has initially tested negative. Blood that has initially tested positive is retested twice. If it retests negative on both retests, the blood is used for donations.

Mrs. Barton's donor's blood was tested in a batch of 143 test tubes.[7] Of these 143 tubes, 134 were being tested for the first time and nine were being retested. Mrs. Barton's donor's blood was being tested for the first time. Of the nine tubes being retested, seven had initially tested positive and two had initially tested negative. On the retest, all nine tested negative. Of the 134 tubes being tested for the first time, all tested negative except for one which tested positive. That positive was subsequently retested in another batch and tested positive again. Mrs. Barton's donor's blood, however, tested negative initially and was not retested.

The Bartons contend that the Red Cross violated the applicable standard of care by failing to retest Mrs. Barton's donor's blood after it initially tested negative. The Bartons base this claim on four theories. First, the Bartons maintain that, whenever one test tube tests positive in a batch of blood being tested, the entire batch should be retested. Second, the Bartons suggest that the Red Cross should have routinely retested all donated blood, even if the blood initially tested negative. Third, the Bartons claim that the particular test kit used to test the batch that

---

**7.** In fact, 149 tubes were tested in the batch but five were controls and one was non-donor blood.

included Mrs. Barton's donor's blood was faulty and unreliable. Finally, the Bartons claim that the Red Cross violated the standard of care by using blood that initially tested positive if it subsequently retested negative.

■ *Initial Positive Test.* As to the first claim, the Bartons' expert, Dr. Schwartz, opined that, when a donor's blood initially tests positive but then retests negative, the entire batch of blood that was initially tested with the donor's blood should be retested. Dr. Schwartz's theory is that this "false positive" raises the possibility that the blood being retested was mislabelled or switched. Thus, according to the Bartons, unless the entire batch is retested, the HIV-positive blood will have passed through the testing process.

This theory is not applicable to the facts of this case. The testimony is undisputed that, in the batch in which Mrs. Barton's donor's blood was tested, only one test tube of blood tested positive. This positive result, from another donor, came out positive again on retesting. Thus, there was no possibility of a mix-up or mislabelling of blood. The Red Cross accounted for the only test tube of blood that tested positive.

■ *Routine Retesting.* The Bartons contend that all blood should be retested, even if the initial result is negative, because the cost of a test is only one dollar and the initial test can be unreliable. The Bartons have not presented any evidence to show that the standard of care requires routine retesting. The Bartons' own expert testified that he was not aware of any studies which showed that retesting initial negative results "would have added anything." He also stated that "the single test was considered sufficient in the instance of negativity" and that the Food and Drug Administration did not require retesting of initial negative results. As to the general reliability of the test used by the Red Cross, Dr. Schwartz stated that he did not know of any problems.

The Bartons claim that the test is generally unreliable because it produces many positive results that turn out negative on retesting. Therefore, they argue that it is also possible that initial negative results could turn out positive on retesting. The Bartons' logic is flawed, however, because the undisputed testimony is that the initial test is designed to be overly sensitive and thus to pick up initial "false positive" results. As Dr. Holland testified, "HIV positive initial tests are not errors or flaws in reliability of the testing, but intended by-products of a cautiously designed test." Accordingly, as the Red Cross's other witnesses testified, retesting initial negative results was not the standard practice for any blood collectors and would not detect more infectious donors.

■ *Faulty Test Kit.* Dr. Schwartz questioned the reliability of the particular test kit that was used to test Mrs. Barton's donor's blood. His concern was due to the retesting, in the same batch as Mrs. Barton's donor's blood, of seven test tubes that had initially tested positive. The retests of all seven came out negative. The retesting of seven test tubes, all of which retested negative after initially testing positive, led Dr. Schwartz to believe that there may have been a problem with the particular test kit or the way in which the test was performed. Nevertheless, Dr. Schwartz would not testify that he believed to a reasonable degree of medical certainty that there was a problem with the test. He stated he needed more information to make that determination but the Bartons have not offered any further testimony from Dr. Schwartz. Moreover, Dr. Schwartz testified that the manner in which the tests were performed was not improper and did not violate the standard of care. Thus, although Dr. Schwartz suggested the possibility of a problem with the test, he refused to state that the test violated the standard of care.

The Bartons attempt to buttress the claim that Mrs. Barton's donor's test was faulty by pointing to a separate batch of blood tested three days later that was completely unrelated to the batch containing Mrs. Barton's donor's blood. In this unrelated batch, 26 tubes that had initially tested positive at some point were retested. Unsurprisingly, 25 of these 26 tubes tested negative on the retest. As explained above, the Red Cross's experts testified that the initial test is intend-

ed to be overly sensitive and that over 90% of initial positive results test negative on retesting. Although Dr. Schwartz raised concern about the retests, he admitted that he did not know what percentage of initial positives will ordinarily test negative on retesting.

■ *Use of Initially Positive Blood.* The Bartons add that the Red Cross should not use blood that initially tests positive even if the blood tests negative on two subsequent retests. Even if using this blood violates the standard of care, however, the Bartons have not shown how such a violation is relevant to this case. The undisputed testimony is that Mrs. Barton's donor's blood initially tested negative. Thus, the use of initially positive blood is not connected in any way to Mrs. Barton's transfusion.

■ Finally, in a general and unfocused effort to show that the Red Cross was negligent, the Bartons have also submitted Food and Drug Administration (FDA) reports of investigations of the Red Cross's blood collection sites in Huntsville, Alabama during May 1988 and May 1990 and Dothan, Alabama during May 1990. These two sites only collect and do not test blood. Mrs. Barton's donor's blood was collected at a site in Montgomery, Alabama and tested at the Red Cross Blood Collection Center in Birmingham, Alabama. Thus, the Huntsville and Dothan reports have little relevance to the procedures followed at the Birmingham testing site.

The Bartons, however, have also submitted FDA reports of investigations of the Birmingham testing site conducted in February–March 1990 and November 1990. The language of the reports is technical and the Bartons have simply presented the reports without submitting other testimony to explain their significance.[8] The reports cite numerous problems at the testing site including problems with the computer data management system, shipment of blood for emergency release prior to completion of testing without proper documentation, faulty equipment such as thermometers and scales, and

that the personnel responsible for the collection and testing of blood lacked sufficient training. In addition, the Bartons claim that the Birmingham testing site was understaffed and that Dr. McGowan, the medical director of that blood bank, was dismissed because she conducted more testing than the national headquarters allowed.

Although the FDA reports and Dr. McGowan's dismissal suggest problems in general with the Birmingham testing site, the Bartons have not pointed to any specific evidence showing that Mrs. Barton's donor's blood was negligently tested. In fact, the Bartons admit that "there is no specific incidence of noncompliance that directly affected the test done on the blood of the donor that was transfused into Rebecca Barton." In addition, the blood that was transfused into Mrs. Barton was collected and tested in June 1988. The FDA investigations were conducted in March and November 1990, over a year and a half after Mrs. Barton's donor's blood was tested. The Red Cross's experts have testified that the Red Cross's testing procedures complied with the standard of care among blood collectors in 1988. The Bartons have failed to present sufficient evidence to raise a genuine issue of fact as to whether the Red Cross violated the applicable standard of care in testing Mrs. Barton's donor's blood.

In addition to the Bartons' failure to present sufficient evidence that the Red Cross violated the standard of care, the Red Cross has presented evidence suggesting a plausible explanation for failing to discover that the donor was HIV-positive in June 1988. As noted above, if a donor contracts HIV within a six-month "window period" of a blood test, the donor's HIV-positive status may simply not show up on an HIV test. Thus, it is possible that the Red Cross properly tested Mrs. Barton's donor's blood but that no test would have picked up that the donor was HIV positive. Accordingly, summary judgment on all of the Bartons' negligence claims should be granted.[9]

---

8. The Bartons note that the Red Cross delayed delivering the reports to them. However, the Bartons never requested that they be allowed to submit affidavits explaining the reports.

9. The Bartons additionally claim that the Red Cross was negligent or wanton in conducting the look-back and transfusion recipient notification procedures. The court notes that it need not

### iii. Fraudulent Suppression

The Bartons claim that for six months, from June 1990 to December 1990, the Red Cross fraudulently suppressed its knowledge that Mrs. Barton's blood donor had tested HIV-positive. The Bartons argue that, once the Red Cross discovered that the donor's blood tested positive on June 9, 1990, the Red Cross had a duty immediately to conduct a confirmatory test. The Bartons further contend that, once the donor's blood was confirmed to be HIV-positive, the Red Cross had a duty immediately to conduct a "look-back" to determine if the donor had previously given blood, and if so, to determine the recipient hospital and inform the hospital of the donor's HIV-positive status. Thus, according to the Bartons, the Red Cross's duty was not merely to disclose information already in its possession but first to conduct an inquiry to determine which hospital, if any, had previously received blood from the donor. Furthermore, because the Red Cross ultimately informed the hospital of the donor's HIV status, the issue is not whether the Red Cross had a duty to conduct an inquiry and to disclose but whether it had a duty to do this within a reasonable period of time.[10]

■ Determining what period of time is reasonable requires reference to a standard of care. The AMLA provides that the "standard of care is that level of such reasonable care, skill and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases," § 6–5–542(2), and that "This definition applies to all actions for injuries or damages or wrongful death whether in contract or tort and whether based on intentional or unintentional conduct." *Id.*

The Alabama Supreme Court has stated that "it is the substance of the action, not the form of the action, that determines whether it is a medical malpractice action and whether it is, therefore, controlled by the provisions of the Alabama Medical Liability Act." *Allred v. Shirley*, 598 So.2d 1347, 1348 (Ala. 1992) (per curiam); *see also Benefield v. F. Hood Craddock Clinic*, 456 So.2d 52, 54 (Ala. 1984). In *Benefield*, the court found that the plaintiff's fraudulent misrepresentation claim was in substance a medical malpractice claim and that the action was controlled by the AMLA. *Id.* However, fraudulent concealment may still be the basis for a medical malpractice cause of action. *Johnson v. McMurray*, 461 So.2d 775, 778 (Ala.1984); *Trammer v. Bernstein*, 596 So.2d 572, 574 (Ala.1991).

The substance of the Bartons' look-back and notification claim is that the Red Cross did not disclose the blood donor's HIV status within six months and that six months was an unreasonable period of time. In order to determine whether six months was unreasonable, the court must start from a standard of care with which to compare the Red Cross's procedures. Despite the Bartons' labelling of their claim as fraudulent suppression, it is in substance a claim for negligence in conducting the look-back and notification process; it is in substance a challenge to medical procedures. Therefore, the provisions of the AMLA control the Bartons' fraudulent suppression claim.

■ Under the AMLA, the Bartons must show that a six-month delay in conducting a look-back and notification was not in accordance with the standard of care pertaining to

address this claim as the Bartons have never amended their complaint to include the claim. After the Bartons were informed of the Red Cross's delay in notifying Mrs. Barton, the Bartons amended their complaint to include only claims for fraudulent concealment or suppression and the tort of outrage. Nevertheless, the Bartons' claim that the Red Cross was negligent or wanton in conducting the look-back and notification procedures also lacks merit for the reasons the court gives in its discussion of their fraudulent suppression claim.

**10.** In addition, although the Bartons claim that the Red Cross delayed notification for six

months, the Bartons' expert on their negligence claims, Dr. Schwartz, stated that the look-back procedure should have begun only after receiving the results of a confirmatory test of the donor's blood. Dr. Schwartz also stated the average time to conduct a confirmatory test is three weeks. The Red Cross did not receive the confirmatory test results until approximately two months after the donor's blood initially tested positive. Thus, using Dr. Schwartz's statements, the delay here was four or five months, rather than six. Nevertheless, for the purposes of summary judgment, the court will assume a six-month delay.

look-back procedures in 1990. The Bartons have failed, however, to present any evidence of the amount of time similarly situated blood collectors took to conduct look-backs and notifications in 1990. Plaintiffs point to the testimony of their expert, Dr. Schwartz, who testified that the look-back and notification "process seemed to be delayed an inordinate length of time." Dr. Schwartz also stated: "The long turn-around time for the Western Blot [the confirmatory test], almost two months, seems out of keeping with usual experience; and the delay to start the look-back between August 7th and September 7th, when I understand this stuff was computerized and probably could have been quickly available, this look-back could be done fairly quickly, but it took them a month to get to that."

Although Dr. Schwartz suggests that the Red Cross should have performed the look-back and notification process more quickly, he does not state that other blood collectors performed the process in less than six months or that six months was an unreasonable amount of time based on the standard of other blood collectors. In fact, Dr. Schwartz admitted that the Red Cross's look-back and notification procedure in 1990 "sounds reasonably close to what everybody else [other blood collectors] was doing." He also admitted that he did not know what the average time period for a look-back and notification was or whether any other blood collectors had time restrictions on how fast the look-back should take, and that, in fact, he has never been involved in a look-back procedure. The 1990 FDA investigation report of the Birmingham testing site, where the look-back was conducted, made no mention of the look-back procedures.[11] Thus, the Bartons have failed to raise a genuine issue of material fact as to their look-back and notification claim under the AMLA.

■■■ Even if the AMLA does not control the Bartons' fraudulent suppression

claim, the Bartons have still failed to present evidence to avoid summary judgment. In order to make out a claim for fraudulent suppression under Alabama law, a plaintiff must show: "(1) a duty to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his injury." *Norman v. Amoco Oil Co.,* 558 So.2d 903, 905 (Ala.1990) (citations omitted). The Alabama Supreme Court has stated that, "In determining the existence of a duty, the trial court makes a legal decision." *Berkel & Co. Contractors, Inc. v. Providence Hosp.,* 454 So.2d 496, 506 (Ala.1984); *see also Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559, 1569 (11th Cir.1987).

■■■ As noted above, the Bartons contend that the Red Cross had a duty to conduct the look-back process and to disclose the blood donor's HIV status within a reasonable period of time. The Red Cross asserts that it had no duty to warn Mrs. Barton of potential danger because no confidential relationship existed between the Red Cross and Mrs. Barton. The court cannot agree. Alabama's fraudulent suppression statute allows recovery even in the absence of a confidential relationship between the parties: "The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Ala.Code 1975 § 6–5–102. *See Jim Short Ford Sales, Inc. v. Washington,* 384 So.2d 83, 86–87 (Ala.1980).

■■■ In the alternative, the Red Cross asserts that an obligation to communicate arises "from the particular circumstances of the case" only when the parties have a direct relationship with direct communications. Again, this assertion is contrary to Alabama law. The Alabama Supreme Court has frequently stated that a duty to disclose "depends upon the relation of the parties, the value of the particular fact, the relative

---

11. One report did note that "Confirmatory Test positive deferred donors may not be notified for up to four months after confirmation. Unaware donors continue to donate during the notification delay and an unsuitable unit can conceivably be distributed."

Although this statement suggests that a four-month period to notify the donor (as opposed to the recipient of the donor's blood) may be long, it does not suggest that a six-month period to notify the recipient is unreasonable.

knowledge of the parties, and other circumstances." *See, e.g., RNH, Inc. v. Beatty,* 571 So.2d 1039, 1042 (Ala.1990); *Jim Short Ford,* 384 So.2d at 86. Although a direct relationship between the parties will usually be present, no direct relationship is required. Instead, "each case must be individually examined to determine whether a duty of disclosure exists; a rigid approach is impossible, and, indeed, the words of the statute itself counsel flexibility." *Jim Short Ford,* 384 So.2d at 87.

Although the Red Cross and Mrs. Barton had no direct relationship, they did have a relationship in that the Red Cross was responsible for supplying the blood that was used in Mrs. Barton's transfusion. Thus, once the Red Cross discovered that the donor was HIV-positive, it had more responsibility to disclose that fact to prior blood recipients than would a third-party, such as a neighbor, who happened to learn that the donor was HIV-positive.

The particular undisclosed fact here, the donor's HIV-positive status, was of tremendous value to Mrs. Barton. Not only did the knowledge affect Mrs. Barton's own health but it also affected her behavior toward her family, especially her husband, and her students. Without the knowledge that she was possibly HIV-positive, she unwittingly put her family and students at risk of becoming infected as well. Thus, the particular fact here did not merely concern the monetary value of merchandise but the lives of numerous individuals.

The Red Cross suggests that the statistical value of the information was low because few transfusion recipients become infected from transfusions. Dr. Alfred Saah, an Associate Professor of Epidemiology, testified that the current risk of obtaining HIV from a transfusion is approximately one in 225,000 and that less than 20 transfusion recipients have been reported HIV-positive since blood collectors have implemented HIV antibody testing. These data, however, are for all transfusions, regardless of the status of the donor. The data do not state the risk of obtaining HIV from a transfusion from a donor who has subsequently tested HIV-positive.

The relative knowledge of the parties also points heavily toward finding a duty to disclose. Mrs. Barton had no way of knowing that the donor had tested positive. The only other point at which Mrs. Barton would have discovered the need for an HIV test would have been once she showed the symptoms of having HIV, a point which could be too late to extend her life or to prevent transmission to others. Thus, all of the facts were within the Red Cross's knowledge.

As to this point, the Supreme Court of Alabama, quoting from Prosser, *Torts* Chap. 18, § 106 (4th ed. 1971), has noted that most courts have found

"a duty of disclosure in cases where defendant has special knowledge or means of knowledge not open to the plaintiff and is aware that the plaintiff is acting under a misapprehension as to facts which would be of importance to him and would probably affect his decision. [Prosser, *supra,* p. 697]"

*Jim Short Ford,* 384 So.2d at 86. Here, the Red Cross had special knowledge not open to Mrs. Barton. In addition, the Red Cross was aware that prior transfusion recipients were acting under a misapprehension that they were not at risk of having obtained HIV from their transfusions. The court therefore concludes that, once the Red Cross learned that a previous donor was HIV-positive, the Red Cross had a duty to conduct a look-back process and to disclose the blood donor's HIV status within a reasonable period of time.

 Although the court finds that the Red Cross had a duty to disclose the donor's HIV status within a reasonable time as a matter of law, the Bartons have failed to present any evidence of what period of time was reasonable. Even if the AMLA does not control the fraudulent suppression claim, the Bartons must still present some evidence that a six-month delay was unreasonable. The testimony of Dr. Schwartz does not suffice. He merely suggested that the Red

Cross could have performed the look-back procedure more quickly without identifying what period of time would be reasonable.[12] Therefore, the court will grant summary judgment as to the Bartons' fraudulent suppression claim.[13]

### iv. Tort of Outrage

■ The Bartons contend that the Red Cross's delay in notifying them of the blood donor's HIV-positive status constitutes the tort of outrage. To recover under the tort of outrage, the plaintiff "must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Green Tree Acceptance, Inc. v. Standridge*, 565 So.2d 38, 44 (Ala.1990). The elements of the tort are met only in rare circumstances: "the conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

The Red Cross asserts that the Bartons have failed to demonstrate any damages from the alleged concealment. The Red Cross correctly points out that the notification delay did not cause Mrs. Barton's husband, children, students or others to become infected. The Red Cross also notes that the Bartons have not presented any evidence that the notification delay altered Mrs. Barton's treatment, condition, or prognosis. Mrs. Barton's treating physician, Dr. Coe, testified that he would not have started AZT treatment any earlier. The Red Cross also contends that, although the Bartons suffered emotional distress upon initially learning of Mrs. Barton's HIV status, the notification delay did not cause any additional compensable emotional distress. By the time the Bartons learned of the notification delay, in February or March 1992, the Bartons already knew that Mrs. Barton had not infected anyone else.

Nevertheless, the court finds that the Bartons have presented sufficient evidence of emotional distress caused by the notification delay. Mrs. Barton testified that upon being told of the delay she was "very upset" and "hurt" that she was "allowed to continue to expose others when there was no need in it." Mrs. Barton also stated that learning of the delay depressed and scared her due to the possibility that she had exposed others during the period of the delay in notification. The court believes that the alleged anxiety that Mrs. Barton suffered as a result of her fear that, during the delay, she may have infected her family and friends is recoverable in damages. This evidence also suffices to raise a genuine issue of material fact as to the Bartons' reliance to their detriment on the Red Cross's notification delay.

The Red Cross notes that the Bartons did not receive any medical treatment for distress related to the notification delay. While this fact is relevant to damages, it is not dispositive. Claims for damages for mental anguish need not be predicated upon the presence of physical symptoms. *See Alabama Power Co. v. Harmon*, 483 So.2d 386, 389 (Ala.1986). The Bartons only need to show some evidence of mental anguish. *Id.* The court finds that the Bartons have raised a genuine issue of material fact as to damages.

**12.** The Bartons also argue that, once the Red Cross voluntarily assumed the duty of informing the Medical Center that the donor was HIV-positive, the Red Cross was under an obligation to act with due care by informing the hospital immediately. The Bartons attempt to analogize this case to a situation in which a person who has no duty to rescue another voluntarily undertakes the rescue and then acts without due care. In that situation, the rescuer has increased the danger to the person being rescued by the voluntary undertaking and therefore must act with due care. The Red Cross, however, did not increase the danger to Mrs. Barton by voluntarily informing the Medical Center. Thus, the Red Cross took on no duty to act immediately.

**13.** Although the court rejects the Bartons' fraudulent suppression claim based on the duty to disclose, the court will nevertheless address the other three parts of the test. The Red Cross contends that, in order to state a claim for fraudulent concealment, the Bartons must show that the Red Cross concealed a material fact with intent to deceive the Bartons. The Alabama Supreme Court, however, has held that, under Ala. Code 1975 § 6–5–102, a showing of the defendant's intent to deceive is not required if the plaintiff shows a confidential relationship between the parties or a duty to disclose from the particular circumstances of the case. *See Chapman v. Rivers Constr. Co.*, 227 So.2d 403, 410 (Ala.1969); *Stone v. Gulf American Fire & Cas. Co.*, 554 So.2d 346, 360 (Ala.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Intent to deceive is only required in the absence of a confidential relationship or particular circumstances imposing a duty to disclose. *Chapman*, 227 So.2d at 410. As the Eleventh Circuit has explained:

"Section 6–5–102 does not require proof of intent to deceive. The breach of an obligation to disclose is sufficient to trigger liability for fraudulent suppression."

*Intercorp., Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1535 (11th Cir.1989) (citing *Chapman*, 227 So.2d at 410). Therefore, had the Red Cross failed to disclose the donor's HIV-positive status within a reasonable time, even without an intent to deceive, the concealment requirement would have been satisfied.

■ The court finds that the circumstances here are not so extreme as to constitute the tort of outrage under Alabama law. As the Bartons concede, the Red Cross did not intentionally delay notifying Mrs. Barton. Although recklessness suffices to make out the tort, the conduct must be even more extreme in the absence of intent. The Red Cross's conduct, however, did not "go beyond all possible bounds of decency." Once the Red Cross received the test results confirming that the blood donor was HIV-positive, the Red Cross delayed approximately four months before informing the hospital. Certainly, some of that time was spent conducting the look-back procedure itself. The Red Cross also first located and notified the donor that she was HIV-positive.

Moreover, the Red Cross had no time limits in its policy guidelines for conducting look-backs and notifications, and the Bartons have not shown that any other blood-banking organization had time restrictions. This lack of guidelines strongly suggests that the Red Cross's delay of six months or less did not constitute outrageous conduct. While other cases involving a longer delay may constitute outrageous conduct, the facts here do not support a finding of outrageous conduct as a matter of law.

### E. Dr. McGowan

■ As explained above, the court finds that the Bartons have failed to present sufficient evidence to raise a genuine issue of material fact on any of their claims against the Red Cross. These same findings are applicable to Dr. McGowan. In addition, Dr. McGowan is entitled to summary judgment because the Bartons have not shown that she was even responsible for any of the policies and actions challenged in this litigation. As to donor screening and advice, Dr. McGowan contends that all donor screening and advice policies were set by the Red Cross National Headquarters and that she was not personally involved in establishing the policies. In-

deed, the Bartons have not challenged any conduct of Dr. McGowan in failing to supervise properly donor screening and advice or in performing the procedure herself. The Bartons have not presented any evidence that Dr. McGowan committed any negligent acts concerning donor screening.

Nor have the Bartons presented any evidence of negligent acts by Dr. McGowan that pertain to the testing of Mrs. Barton's donor's blood. At most, as noted above, the Bartons have presented FDA investigation reports that there were problems in general at the testing site and that Dr. McGowan was ultimately dismissed. However, the Bartons have not shown how this evidence affected the testing of Mrs. Barton's donor's blood. Finally, the Bartons have not presented any evidence that Dr. McGowan was involved in the look-back and notification procedure concerning Mrs. Barton's donor or that her supervision of the look-back and notification was negligent, other than evidence of problems in general at the testing site.

### II. MOTION TO DISMISS

Dr. McGowan, who is being sued in her individual capacity, has filed a separate motion to dismiss contending that she is entitled to absolute immunity from suit as a policy-making employee of a federal instrumentality. She also contends in the alternative that the Bartons' jury demand and claims for punitive damages should be struck. Although Dr. McGowan is entitled to summary judgment as to all claims against her, the court will still address her separate contentions in order to provide a complete record.

■ Federal employees suable in their individual capacities under state tort law are entitled to absolute immunity if the challenged conduct is "within the scope of their official duties *and* the conduct is discretionary in nature." *Westfall v. Erwin*, 484 U.S. 292, 297–98, 108 S.Ct. 580, 584, 98 L.Ed.2d 619 (1988) (emphasis in original).[14]

---

14. In response to *Westfall*, Congress enacted the Federal Employees Liability Reform and Tort Compensation Act (FELRTCA), 28 U.S.C.A. § 2679(b)(1), which creates absolute tort immunity for those federal employees working for federal entities covered by the Federal Tort Claims

Act (FTCA), 28 U.S.C.A. §§ 1346(b), 2671–2680. This absolute immunity extends to all acts of these employees within the scope of their employment regardless as to whether the acts are discretionary. *See United States v. Smith*, 499 U.S. 160, 162–163, 111 S.Ct. 1180, 1183–84, 113

The Eleventh Circuit has extended this immunity to employees of federal instrumentalities. *See Franks v. Bolden,* 774 F.2d 1552, 1554–55 (11th Cir.1985) (official immunity available to employees of Tennessee Valley Authority (TVA)); *see also Milligan v. American Hoist & Derrick Co.,* 622 F.Supp. 56, 58 (W.D.Tenn.1985) ("TVA personnel, as employees of a federal instrumentality, may invoke the full range of immunity"). And, as explained in earlier orders by this court, the Red Cross, like the TVA, is a federal instrumentality. In *Barton v. American Red Cross (Barton II),* 826 F.Supp. 407 (M.D.Ala. 1993), this court held that the Red Cross, as a federal instrumentality, is not subject to punitive damages, and in *Barton v. American Red Cross (Barton III),* 826 F.Supp. 412 (M.D.Ala.1993), the court held that the Red Cross, as a federal instrumentality, is subject to "nonjury" trial only. The Bartons argue, however, that the fact that an entity may be a federal instrumentality for one purpose does not mean that it is a federal instrumentality for another purpose. *See Barton III,* 826 F.Supp. at 413 (discussing this distinction). Assuming this to be true, the court is still convinced that the Red Cross is a federal instrumentality to the extent that its employees enjoy absolute immunity under *Westfall.*

In *Westfall,* the Supreme Court explained that the reason behind official immunity is "that the threat of liability will make federal officials unduly timid in carrying out their official duties, and that effective government will be promoted if officials are freed of the costs of vexatious and often frivolous damage suits." 484 U.S. at 295, 108 S.Ct. at 583. The threat posed by litigation to the ability of officials to carry out their duties, unintimidated, in the national interest is the same for both the Red Cross and the federal government. In *Department of Employment v. United States,* 385 U.S. 355, 360, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966), the Supreme Court wrote that the Red Cross enjoys the "status" of being "virtually . . . an arm of the Government." The Court explained that "Congress chartered the present Red Cross in 1905, subjecting it to governmental super-

vision and to a regular financial audit by the Defense . . . Department." *Id.* (citation omitted). *See* 36 U.S.C.A. §§ 1, et seq. The Court continued that "Its principal officer is appointed by the President, who also appoints seven (all government officers) of the remaining 49 Governors," *id.* (citation omitted); that "By statute and Executive Order there devolved upon the Red Cross the right and the obligation to meet this Nation's commitments under various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster assistance to the States in time of need," *id.* (footnotes omitted); and that, "Although its operations are financed primarily from voluntary private contributions, the Red Cross does receive substantial material assistance from the Federal Government." *Id.* (footnote omitted). Therefore, as this court explained in *Barton III,* "the Red Cross is so intertwined with and essential to the operation of the federal government, both internationally and domestically, that litigation poses the same potential for interference with public administration to the Red Cross as it does to the federal government in general." 826 F.Supp. at 413–14. The Red Cross should be placed on a par with the federal government when it comes to the question of the extent to which the Red Cross should be open, or not open, to litigation. Thus, the court must begin with the premise that the employees of the Red Cross are entitled to official immunity from litigation if the challenged conduct is within the scope of their official duties and the conduct is discretionary in nature. ·

▮▮▮ It is clear that Dr. McGowan's challenged conduct was within the scope of her official duties. Therefore, the only question is whether the conduct was discretionary in nature. The Supreme Court has not defined the precise meaning of discretionary conduct within the context of official immunity. However, in *United States v. Gaubert,* 499 U.S. 315, ——, 111 S.Ct. 1267, 1273, 113

L.Ed.2d 134 (1991). Neither the Bartons nor the defendants contend that the FELRTCA applies to

the Red Cross.

L.Ed.2d 335 (1991), a recent case interpreting the discretionary function exception to liability under the Federal Tort Claims Act (FTCA), 28 U.S.C.A. §§ 1346(b), 2671–2680, the Court outlined some principles which would be equally applicable to claims of official immunity. The FTCA's discretionary function exception, § 2680(a), is similar to official immunity for discretionary conduct. The section provides in part that the government is not liable for acts of employees "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty."

In interpreting this FTCA exception, the Court in *Gaubert* applied a two-part test. First, the trier of fact must determine whether the challenged act or omission was the product of judgment or choice or, instead, violated a mandatory regulation or policy. *Id.* at ——, 111 S.Ct. at 1273.[15] Second, " 'even assuming the challenged conduct involves an element of judgment,' " the factfinder must then determine whether the challenged act or omission is the kind of conduct " 'that the discretionary function exception was designed to shield,' " *id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)), that is, conduct "grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at ——, 111 S.Ct. at 1275.[16]

The Eleventh Circuit Court of Appeals previously stated that official immunity extends only to acts "involving planning or policy considerations" and not to those which "concern day-to-day operations." *Bolden*, 774 F.2d at 1555 (citations omitted). *See also Andrews v. Benson*, 809 F.2d 1537, 1543 (11th Cir.1987) (the acts of a supervisor in insuring the day-to-day enforcement of an agency's standards and regulations are not

discretionary). However, in *Autery v. United States*, 992 F.2d 1523 (1993), the Eleventh Circuit rejected a similar distinction in the context of the FTCA:

"The Supreme Court squarely rejected this proposed distinction in *Gaubert*, ruling that the Fifth Circuit 'erred in holding that the [discretionary function] exception does not reach decisions made at the operational or management level.' *Gaubert*, [499] U.S. at ——, 111 S.Ct. at 1275. 'Discretionary conduct is not confined to the policy or planning level.' *Id.; see also [United States v. S.A. Empresa de Viacao Aerea Rio Grandense] Varig Airlines*, 467 U.S. [797,] 813, 104 S.Ct. [2755,] 2764 [81 L.Ed.2d 660 (1984) ] ('[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case')."

992 F.2d at 1527 (footnotes omitted). In light of *Gaubert* and *Autery*, this court concludes that official immunity includes not only acts involving planning or policy considerations but also those which concern day-to-day operations.

▮ Furthermore, in determining whether an employee enjoys official immunity, a court should be cautious not to forge a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function, but should instead look to the nature of the challenged decision in an objective, or general sense and ask whether that decision is one which a reasonable person would expect inherently to be grounded in considerations of policy. *Cf. Autery*, 992 F.2d at 1530 (requiring a similar approach for determinations under the FTCA's discretionary function exception).

---

15. In *Gaubert*, the Court explained that:

"The requirement of judgment or choice is not satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow,' because 'the employee had no rightful option but to adhere to the directive.' "

*Id.* at ——, 111 S.Ct. at 1273 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)).

16. In *Gaubert*, the Court discussed the type of conduct that would meet the first but not the second test:

"[If a governmental official] drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Id.* at —— n. 7, 111 S.Ct. at 1275 n. 7.

As outlined above, the Bartons challenge a number of different actions allegedly taken by Dr. McGowan and policies set by the Red Cross. Although Dr. McGowan denies that she was personally involved in setting any of the policies that the Bartons challenge, the court will take the allegations of the Bartons' complaint as true and will assume, for purposes of Dr. McGowan's motion to dismiss, that she was involved in the challenged actions for the purpose of discussing her immunity defense. The Bartons' claims fall into three areas.

First, the Bartons claim that Dr. McGowan failed to advise prospective blood donors that they are at risk of having AIDS and should not give blood if they have been heterosexually promiscuous or if they have been the sexual partner of a person who has been heterosexually promiscuous. The Bartons also maintain that the donor health screening questionnaire should have asked prospective donors if they have been heterosexually promiscuous. The Bartons do not contend that Dr. McGowan failed to ask a specific question or offer any specific advice that Red Cross policy required. Rather, they challenge the choice of questions to ask prospective donors. Thus, on their face, these challenges involve judgment or choice. Furthermore, because the challenges involve the setting of blood screening policy, they are "grounded in the policy of the regulatory regime" of the Red Cross.

Second, the Bartons claim that Dr. McGowan failed to retest Mrs. Barton's donor's blood after it initially tested negative. They base their claim on four theories. As explained in greater detail above, the first three of these theories are: whenever one test tube in a batch of blood tests positive, the entire batch should be retested; all blood should be routinely retested; and blood that initially tests positive should never be used. These three theories involve judgment and the setting of policy concerning blood testing and which blood may be used. Thus, assuming Dr. McGowan set these policies, she would be entitled to immunity. The Bartons'

fourth theory is that the particular test kit that was used to test Mrs. Barton's donor's blood was faulty or that the manner in which the test was performed was improper. This claim does not go to the setting of blood testing policy but to the performance of the test itself. Although the performance of the test may involve some judgment, that judgment is not grounded in setting the Red Cross's regulatory policy. As witnesses for defendants explained, the Red Cross used a specific type of HIV test on donors' blood. The persons who tested the blood were not free to choose a different test. The test kit had specific instructions for performing the test which were to be followed. Therefore, to the extent that Dr. McGowan was personally involved in the testing itself, she would not be entitled to immunity.

Third, the Bartons claim that Dr. McGowan was responsible for overseeing the look-back and notification procedure after Mrs. Barton's donor's blood tested positive in 1990 and suggest that her supervision of the process resulted in an unreasonable delay in informing Mrs. Barton of the donor's HIV-positive status. The Red Cross had no policy concerning the amount of time in which a look-back and notification was to be conducted. Nevertheless, the decision as to how long the procedure should take involved judgment and the setting of regulatory policy. Therefore, to the extent Dr. McGowan was responsible for supervising the look-back and notification procedure, she had to set policy in determining how long the procedure would take and is entitled to immunity.[17]

### III. CONCLUSION

With this memorandum opinion, the court should not be understood as having concluded that the Barton family has not suffered a great tragedy; it has. Everyone connected with this litigation cannot help but feel deeply for Mrs. Barton and her family. Nevertheless, if this court is to remain faithful to the rule of law it must conclude that the facts presented do not warrant relief under the law relied upon by the Bartons. An appro-

17. To the extent that Dr. McGowan is not entitled to absolute immunity and thus is open to liability in her individual capacity, she is similar-

ly not entitled as an individual to governmental immunity from punitive damages or from trial by jury.

priate judgment will be entered on the motion to dismiss and the motions for summary judgment filed by the Red Cross and Dr. McGowan.[18]

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the motion to dismiss filed by defendant Eoline McGowan, M.D., on March 9, 1993, is granted as to all of the plaintiffs' claims except their "faulty test kit" claim;

(2) That the motions for summary judgment filed by defendants American Red Cross and Eoline McGowan, M.D., on January 25, 1993, are granted in full; and

(3) That final judgment is entered in favor of the defendants and against the plaintiffs, with plaintiffs taking nothing by their complaint.

It is further ORDERED that costs are taxed against the plaintiffs, for which execution may issue.

18. Mrs. Barton's husband and two sons have asserted derivative claims for loss of Mrs. Barton's services. Because full summary judgment and partial dismissal are warranted as to Mrs. Barton's main claims, the same disposition is warranted as to her husband's and her sons' derivative claims.