The defendant, Baptist Medical Center Montclair (the "Hospital"), appeals from a $600,000 judgment based on a jury verdict against it, and from a denial of a motion for a judgment notwithstanding the verdict, or, in the alternative, for a new trial or remittitur, in a medical malpractice action brought by Myra and George Wilson as the parents of Dana Jean Wilson, a deceased minor. We affirm.
The Hospital raises two issues on appeal: (1) whether the Wilsons complied with Ala. Code 1975, § 6-5-551, requiring pleading with specificity in medical malpractice actions, and (2) whether the Wilsons presented substantial evidence that the Hospital's negligent acts or omissions were the proximate cause of Dana Jean's death.
In 1985 Myra Wilson had twins delivered by cesarean section ("c-section"). Thereafter, she became pregnant a second time, and, on the advice of her physician, Dr. Ronald Orso of Birmingham Obstetrics/Gynecology P.A, she chose to attempt a vaginal birth. The risk in having a vaginal birth after a c-section ("VBAC") is the possibility that the scar tissue in the uterus, from the c-section, will rupture during the vaginal birth and cause "fetal distress," meaning injury to the fetus.
When, during the second pregnancy, Myra reported experiencing labor contractions, Dr. Orso recommended to the Hospital that it observe Myra as a VBAC patient to determine whether she was in active labor. The Hospital placed her under observation at approximately 12:55 a.m., November 23, 1987. At 1:00 a.m., nurse Barbara Caslin performed a vaginal examination on Myra and determined that her uterus was "tight finger tipped," meaning her cervix was not dilated. She, therefore, concluded that, even though Myra was complaining of contractions, she was not in active labor. Also at 1:00 a.m., Caslin began monitoring the fetus's heart rate. At that time, the rate was normal.
Caslin examined Myra again at 2:40 a.m. and found no change. At approximately 4:40 a.m., Myra told Caslin that she felt as though she needed to go to the bathroom. Caslin brought a bedpan, but Myra had no bowel movement. Ten minutes later Caslin removed the bedpan. Shortly thereafter, *Page 1337 
Myra experienced a sharp pain. Within moments, Myra and her husband noticed vaginal bleeding. He summoned nurse Ann Little from the nurses' station. Myra told Little that she felt as though her stomach had ripped open and the baby had moved up towards the ceiling. At approximately 5:20 a.m. Little performed a pelvic examination on Myra. She determined that Myra's cervix was completely dilated and that the fetus's heart rate had dropped to 60 to 70 beats per minute. She reported the findings of her examination to Dr. Orso, but she did not tell him about the ripping sensation Myra had reported or the vaginal bleeding Myra had experienced.
At approximately 5:36 a.m., Dr. Orso examined Myra. From his pelvic examination, Dr. Orso found that, contrary to Little's report, Myra's cervix was not dilated. He called for an emergency c-section at 5:46 a.m. At that time, nurse Caslin increased the oxygen supply to the fetus. At 5:59 a.m., Dr. Orso delivered Dana Jean by c-section. The surgery disclosed that Myra had suffered a catastrophic rupture of the uterus and fetal distress, meaning her scar tissue had torn and the fetus had been pushed from the uterus into the abdominal cavity, separating the placenta and compressing the umbilical cord.
Dana Jean died on April 22, 1988, as a result of brain damage she sustained during birth. On November 27, 1989, the Wilsons sued the Hospital, alleging that it had negligently failed to render appropriate medical care to Myra and Dana Jean during delivery and post-delivery. The Wilsons also sued Dr. Orso and Birmingham Obstetrics/Gynecology P.A., alleging negligence but, prior to trial, they negotiated a pro tanto settlement with those defendants.
 I.
The first issue presented by the Hospital's appeal is whether the Wilsons complied with § 6-5-551. It provides:
 "In any action for injury, damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care the plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial."
The Hospital argues that the judgment against it should be reversed because the Wilsons' complaint did not describe with particularity each act or omission alleged by the Wilsons, at trial, to be negligent. Instead, the Hospital says, the plaintiffs' trial expert, Dr. Michael Cardwell, testified to "a shotgun blast" of negligent acts, none of which had been specifically alleged in the Wilsons' complaint.
The Wilsons' complaint stated:
 "[O]n or about November 23, 1987, . . . Baptist Medical Center-Montclair [was] employed . . . to render safe, adequate . . . medical care and prenatal care. Defendants did negligently render or fail to render proper medical care . . . to Myra and Dana Jean Wilson.
". . . .
 "Defendant, Baptist Medical Center-Montclair, . . . was negligent through its nursing staff in failing to determine that the baby, Dana Jean Wilson, was in breech position and could not be delivered in the position in which she was in. Further, that said defendant through its employees failed to take appropriate action once its employees learned of fetal distress and the breech position of the baby.
". . . .
 "As a direct consequence of the negligence, . . . Dana Jean Wilson . . . suffer[ed] brain damage."
The Hospital contends that the complaint specifically alleged only that the Hospital was negligent in failing to detect that Dana Jean was in a breech position, and it says, at trial, the Wilsons presented no evidence that the baby was in a breech position. Admittedly, the breech position of the baby was not an issue at trial. However, the *Page 1338 
allegation as to Dana Jean's breech position was not the only allegation specified in the complaint. The complaint also alleged that the Hospital "was negligent through its nursing staff in failing to determine that . . . Dana Jean . . . could not be delivered in the position in which she was in" and in failing "to take appropriate action once the employees learned of the fetal distress." The foremost negligent acts or omissions identified by the plaintiffs' expert at trial were the nurses' failure to detect and report to Dr. Orso the symptoms of uterine rupture, specifically, their failure to notify him of rectal pain and vaginal bleeding, their failure to notify him that the cervix had not dilated, and the nurses' failure to react properly in a fetal distress situation, particularly their failure to increase the oxygen supply to the fetus at 5:20 a.m. when its heart rate dropped. Additionally, the Wilsons' complaint identified the time and place at which the alleged negligence occurred and the resulting harm.
Further, the Hospital does not allege that a detailed specification and factual description of each act and omission alleged was not communicated to it. In its order denying the Hospital's post-judgment motion for a judgment notwithstanding the verdict, the trial court stated: "The defendant BMC was given adequate notice of the issue tried in this case, regarding the negligence of the BMC obstetrical nursing staff, in the pleadings and amplified in the pretrial order. The issues were discussed in detail at the pretrial conference." The pretrial order to which the trial court referred was the amended pretrial order, issued August 2, 1991. It stated: "Plaintiffs' Position. That Baptist Medical Center-Montclair failed to have adequate OB policies and procedures for handling patients such as Mrs. Wilson being permitted a trial of labor after having prior c-section; . . . the nursing staff was negligent in that they failed to respond appropriately under the circumstances." On September 20, 1991, the Hospital deposed Dr. Cardwell. The trial began on February 11, 1992. From these facts, we infer that the Hospital knew, well before the 90 days contemplated under § 6-5-551, which acts or omissions Dr. Cardwell would identify as negligent.
For these reasons, we conclude that the Wilsons complied with § 6-5-551.
 II.
We therefore turn to the second issue: whether the Wilsons presented substantial evidence that the Hospital's negligent acts or omissions were the proximate cause of Dana Jean's death.
The parties stipulated that Dana Jean died as a result of brain damage sustained during birth. To establish what standard of care was required of the Hospital's obstetrical nurses and how the Hospital's alleged failure to meet that standard caused Dana Jean's injuries, the plaintiffs presented expert testimony by Dr. Cardwell, the chief of obstetrics and director of maternal-fetal medicine at the University of Missouri. As chief of obstetrics, Dr. Cardwell trains nurses in the treatment of VBAC patients. The record shows that the Hospital knew Myra was a VBAC patient when it placed Myra under observation. Dr. Cardwell testified that the following acts or omissions by the Hospital's nurses were negligent:
 "A. . . . The nurse should have notified a physician of anything deviant from the regular course of labor. . . . Particularly, at around 4:40 [a.m.], when Mrs. Wilson complained of the rectal pain or pressure. In my opinion, at that point she was showing evidence of a uterine rupture that should have been related to Dr. Orso. . . . [Further], [t]he nurse, when she examined the patient at 5:20 [a.m.], . . . did not . . . evaluate the pelvic examination of Mrs. Wilson appropriately. The nurse described the cervix as being completely dilated; but, in actuality, . . . her cervix was not dilated. Based on the improperly performed vaginal examination, Dr. Orso proceeded to manage Mrs. Wilson in the way he did.
". . . .
 "A. . . . Another deviation from the standard of care is that at approximately 5:20 [a.m.], when the baby's heart [rate] *Page 1339 
dropped, . . . the nurse should have started oxygen on Mrs. Wilson to get increased oxygen to the baby so the baby wouldn't have any difficulty with what we call hypoxia, or low oxygen, in the baby's blood system. However, the oxygen was not started until approximately 15 minutes after the heart [rate dropped].
". . . .
 "A. . . . It is the standard of care that when the fetal heart . . . rate drop[s] down from the normal range, as it did in this case, . . . oxygen is started automatically by the nurse without a doctor's order."
As to how the nurses' negligence delayed the c-section, he testified:
 "A. . . . [I]f a reasonable prudent obstetrician was given the correct status of Mrs. Wilson's cervix at 5:20 [a.m.], he would have delivered the baby by emergency cesarean section at that point."
Finally, as to how the injuries Dana Jean sustained during her birth ultimately caused her death, he stated:
 "A. . . . [W]hen the uterus finally completely ruptured at the end, the baby was extruded, or pushed out of the uterine cavity; and that a combination of the compression of the umbilical cord, and because the baby wasn't being surrounded by the bag of waters any more, and a separation of the placenta caused a decreased oxygen supply to the baby. The decreased oxygen supply caused brain damage in this particular baby, and that brain damage was so overwhelming that, eventually, the baby . . . die[d]."
The Hospital argues that it is entitled to a reversal of the judgment against it because, it says, Dr. Cardwell's testimony did not establish, by substantial evidence, that the nurses' failure to detect and report to Dr. Orso the symptoms of uterine rupture was the proximate cause of Dana Jean's death. As support for its argument, the Hospital has extracted from Dr. Cardwell's testimony the following questions and responses and points out that Dr. Cardwell never stated that an earlier c-section would have saved Dana Jean's life:
 "Q. . . . Do you have an opinion based on a reasonable degree of medical certainty [as to] whether any of the deviation[s], that you have enumerated from the standard of care by the Hospital, . . . contributed in any way to . . . [Dana Jean's] death . . . ?
". . . .
"A. Yes.
"Q. Would you tell the jury your opinion?
". . . .
 "A. The nurses' negligent care of Mrs. Wilson and her baby led to a delayed cesarean section by Dr. Orso. If the nurses [had] related the information appropriately to Dr. Orso, he would have intervened earlier and delivered the baby by cesarean section."
Admittedly, Dr. Cardwell's response to this particular question was incomplete; however, his testimony, when taken as a whole, provided the jury with adequate evidence to allow it to find that the Hospital's failure to detect and report to Dr. Orso the symptoms of uterine rupture and the Hospital's failure to react properly to a fetal distress situation proximately caused Dana Jean's death.
Because we have concluded that the Wilsons complied with § 6-5-551 and that they presented substantial evidence at trial that the Hospital's negligent acts or omissions were the proximate cause of Dana Jean's death, we affirm the judgment against the Hospital.
AFFIRMED.
SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
HOUSTON and STEAGALL, JJ., concur in the result.
MADDOX, J., dissents.