On Application for Rehearing

MURDOCK, Justice.
The opinion of October 19, 2012, is withdrawn, and the following is substituted therefor.
Myrtis Hill[1] sued the following entities and individuals in the Jefferson Circuit Court: Fairfield Nursing and Rehabilitation Center, LLC (“Fairfield”); D & N, LLC (“D & N”); DTD HC, LLC (“DTD”); Donald T. Denz; Norbert A. Bennett; Aurora Cares, LLC (alleged to be doing business, and herein sometimes referred to, as “Tara Cares”); and Aurora Healthcare, LLC (collectively referred to as “the defendants”).[2] Hill stated claims based upon the Alabama Medical Liability Act, § 6-5-540 et seq., Ala.Code 1975 (“the AMLA”), arising out of the fact that she suffered a broken leg while being helped out of bed by a nursing assistant at a nursing home owned and operated by Fairfield (“Fair-field Nursing Home”). Before trial, on motion of the defendants, the trial court entered a summary judgment in favor of all the defendants except Fairfield. At trial, at the conclusion of Hill’s case-in-chief, the trial court entered a judgment as a matter of law in favor of Fairfield. Hill appeals the judgments of the trial court as to all the defendants. We reverse.

I. Facts

At the time of the events at issue, Hill was an 85-year-old resident of Fairfield Nursing Home, a 190-bed skilled-nursing facility owned and operated by Fairfield. In the late 1970s, Hill had a stroke that resulted in paralysis in her left side. She was admitted to Fairfield Nursing Home in 1992 after suffering a broken ankle in a fall at her daughter’s house.
On May 10, 2006, Hill was being helped out of her bed at the nursing home by LaShaka Smith, a certified nursing assistant, when she lost strength in her legs and either fell or was lowered to the ground by Smith. During that event, her *400 left leg was bent backward and hit the bed. After Hill complained of pain, she was sent' to the University of Alabama at Birmingham Hospital for evaluation and was diagnosed with a broken leg.
Hill subsequently initiated this action, seeking compensatory and punitive damages for her injury. The gravamen of her claims is that her broken leg was caused by the failure of Fairfield employees to use proper safety measures when transferring her from her bed. The claims against Fairfield were based on this alleged negligence. The claims against the other defendants were based, among other things, upon Hill’s claim that Fairfield served as the alter ego of those other defendants and that the “corporate veil” between those defendants and Fairfield should be “pierced.” A more complete discussion of facts pertinent to this latter claim is set out in Part III.C., below.
In response to a motion for a summary judgment filed by the defendants, Hill made an extensive evidentiary submission to the trial court. After conducting a hearing, the trial court denied the defendants’ summary-judgment motion. Subsequently, the defendants moved the trial court to reconsider its denial of their summary-judgment motion. Hill again opposed the motion; however, this time the trial court granted the summary-judgment motion in part, entering a summary judgment in favor of all the defendants except Fairfield. The trial court did not explain the rationale for its ruling.
The case against Fairfield proceeded to trial. Over the course of a week, the jury heard testimony from Hill; Hill’s son, Fred Hill; Janie Dawson, director of nursing at Fairfield Nursing Home; Dr. David Volgas, who treated Hill’s leg after the accident; and Toya Nelson, a registered nurse who testified as an expert regarding the applicable standard of care. After Hill concluded her case, Fairfield moved for a judgment as a matter of law, arguing, among other things, that Hill had failed to establish by way of expert testimony from a similarly situated health-care provider that the applicable standard of care had been breached. Fairfield also argued that Hill had failed to establish that the transfer from her bed probably caused her injury. The trial court orally granted the motion and entered a judgment as a matter of law in favor of Fairfield that same day. Hill subsequently moved the trial court to alter, amend, or vacate its judgment. The trial court denied that motion, and Hill appealed.

II. Standard of Review

Hill argues that the trial court erred both by entering a summary judgment in favor of all the defendants except Fairfield on November 13, 2009, and by entering a judgment as a matter of law in favor of Fairfield at the conclusion of Hill’s case-in-chief on November 23, 2009.
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a *401 genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
‘“We apply the same standard of review to a ruling on a motion for a [judgment as a matter of law] as the trial court used in initially deciding the motion. This standard is “indistinguishable from the standard by which we review a summary judgment.” Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002). In Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala. 2000), this Court stated that ‘“[s]ub-stantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’” 791 So.2d at 923 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)).’
“Alabama Power Co. v. Aldridge, 854 So.2d 554, 560 (Ala.2002).”
Black v. Comer, 38 So.3d 16, 22 (Ala.2009).

III. Analysis

“The plaintiff in a medical-malpractice action is required to present substantial evidence indicating both that the defendant health-care provider ‘failed to comply with the standard of care and that such failure probably caused the injury or death in question.’” Mobile OB-GYN, P.C. v. Baggett, 25 So.3d 1129, 1133 (Ala.2009) (quoting § 6-5-549, Ala.Code 1975). On appeal, Hill argues that, during the presentation of her case-in-chief, she adduced substantial evidence indicating that Smith breached the standard of care applicable to Hill’s treatment and that her breach proximately caused Hill’s injury. The defendants counter that Hill established neither a breach of the standard of care nor causation. These issues are discussed in Parts III.A. and III.B., below.
Hill also challenges on appeal the trial court’s summary judgment as to the defendants other than Fairfield, which requires us to examine the evidence submitted by Hill in support of her claim that the “corporate veil” between Fairfield and the other defendants should be “pierced.” This issue is addressed in Part III.C., below.[3]
We turn first to the question whether Hill established a breach of the standard of care.

A. Hill’s Expert Testimony Concerning the Standard of Care

In cases brought under the AMLA, the plaintiff generally must establish through expert testimony that there has been a breach of the standard of care; “such expert testimony is allowed only from a ‘similarly situated health care provider.’ ” Holcomb v. Carraway, 945 So.2d *402 1009, 1012 (Ala.2006). Section 6-5-548(b), AIa.Code 1975, states that a “similarly situated health care provider” is one who meets all the following qualifications:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.”
At trial, Hill sought to establish a breach of the standard of care through testimony from her expert witness Nelson, a registered nurse since 1997, who had worked in skilled-nursing facilities and who had supervised both certified nursing assistants and licensed practical nurses. In her brief to this Court, Hill summarizes Nelson’s testimony as follows:
“Nelson testified that regardless of whether Ms. Hill was ‘dropped’ or ‘lowered to the floor’ that [Fairfield employee] Smith breached the standard of care. First, Nelson testified that Smith breached the standard of care because Smith did not use [a mechanical] lift and instead tried to carry or assist Ms. Hill. Second, Nelson testified that Smith breached the standard of care by failing to use a gait belt when transferring Ms. Hill. Gait belts ‘should be used when a client needs assistance with any transfer or for mobilization.’ Third, Nelson testified that Smith breached the standard of care by transferring Ms. Hill alone. She testified that the care plan and the daily care guide’s silence on the number of persons needed for transfer was not tantamount to a directive that only one person was required. Expert Nelson has testified that these breaches of the standard of care by Smith combined with the breaches of the standard of care by the Fairfield nurses who failed to put the proper information in the care plan and daily care guides to cause Ms. Hill’s leg to forcefully strike the floor.”
Hill’s brief, pp. 46-47.[4]
The defendants argue that Nelson was not qualified to give this testimony regarding the standard of care because, they contend, the level of assistance that must be given to residents of Fairfield Nursing Home when they are moved is determined by the physical-therapy department at the nursing home, not the nursing department. (The evidence in the record indicates that the physical-therapy department, in its April 2006 assessments of Hill, had not mandated that Hill required a mechanical lift, a gait belt, or multiple staff members for transfers.) Accordingly, the defendants argue, because Nelson was not licensed, trained, or experienced in the field of physical therapy, she was not a similarly situated health-care provider qualified to testify as to the standard of care applicable *403 to Hill’s transfer and whether that standard was breached.[5]
Nelson acknowledged that she was not a physical therapist and that she could not testify regarding the standard of care that applies to physical therapists. During Nelson’s trial testimony, Fairfield’s counsel told Nelson that the physical-therapy department was the entity at Fairfield Nursing Home responsible for assessing whether residents needed transfer assistance. He then asked Nelson whether she would have to “defer to [physical therapists] with respect to whether it was a proper choice” not to use a lift to transfer Hill. Nelson responded:
“A. No.
“Q. [Fairfield’s counsel:] You wouldn’t? “A. No.
“Q. Why not?
“A. Because as a nurse, I can assess as to whether or not a resident needs a lift.”[6]
This Court has stated:
“[T]he trial court must answer the following questions before determining that an expert witness is ‘similarly situated’ as to the defendant:
‘“(1) What is the standard of care alleged to have [been] breached? (2) Is the defendant “health care provider” a specialist in the discipline or school of practice of the standard of care that the court has previously determined is alleged to have been breached? (B) Does the proffered expert witness qualify as a “similarly situated health care provider” under the subsection determined in the second step to apply?’ ”
HealthTrust, Inc. v. Cantrell, 689 So.2d 822, 826 (Ala.1997) (quoting Medlin v. Crosby, 583 So.2d 1290, 1293 (Ala.1991)).
As to the first of these questions, Hill contends that the standard of care alleged to have been breached is the standard of care for nurses. The defendants contend it is the standard of care for physical therapists.
“[I]n applying subsections (b) and (c) [of § 6-5-548, Ala.Code 1975,] to those instances where the defendant is a non-individual, such as a professional corporation or a medical institution, which has acted through another individual health care provider, the focus should be on the individual practitioner whose specific action allegedly fell below the required standard of care.”
Barton v. American Red Cross, 829 F.Supp. 1290, 1301 (M.D.Ala.1993), cited with approval in Husby v. South Alabama Nursing Home, Inc., 712 So.2d 750 (Ala. 1998). Smith, a certified nursing assistant, was providing nursing services to Hill at the time Hill suffered her injury. Smith was not acting as a physical therapist or providing physical-therapy services to Hill (a circumstance that arguably would disqualify, not qualify, a physical therapist from testifying as to the standard of care applicable to a provider of nursing care to a patient). Furthermore, one of the ways Fairfield allegedly breached its duty in this case was through the preparation of an allegedly inadequate care plan and daily *404 care guides that were being followed by-Smith when she dropped Hill. These plans and guides were prepared by the attending nurses responsible for Hill’s care.
Nonetheless, at least insofar as Fair-field’s own liability as an institutional medical provider is concerned, the defendants seek to rely upon the fact that Fairfield had delegated to its physical-therapy department responsibility for making patient-transfer assessments. Such reliance is misplaced. Ultimately, the defendants’ position would allow any institutional medical provider to control the standard of care for which it will be held responsible simply by having some department within its corporate structure, rather than the law, select the standard of care applicable to various activities undertaken by its individual medical-provider employees.[7]
In a case with both factual and legal similarities to the present case, Husby v. South Alabama Nursing Home, Inc., supra, this Court addressed the sufficiency of evidence relating to claims against a nursing home and two of its administrators by a resident who was injured in a fall from her bed allegedly resulting from the failure of nurses to use proper physical restraints. This Court held that a plaintiff seeking to hold those parties liable based upon the alleged negligence of the nurses could not use a hospital administrator or an anesthesiologist as a proper expert witness relating to the standard for “hands on” nursing care:
“The defendants cite Barton v. American Red Cross, 829 F.Supp. 1290 (M.D.Ala.1993), aff'd, 43 F.3d 678 (11th Cir.1994), for the proposition that the focus should be on the individual practitioner whose specific action is alleged to have fallen below the standard of care. We accept that proposition, and we conclude that the focus in this case should be on the standard of care owed by the nurses who rendered direct care to Husby. Also, when a defendant is not an individual, it is logical to limit the admissible expert testimony to that coming from witnesses who are, as to the specific individual whose actions formed the basis for the litigation, similarly situated. Thus, we will apply the same standard of care, that governing a nurse administering direct care, to all three defendants.”
712 So.2d at 753 (emphasis added).
Based on the foregoing, we must conclude that Nelson was a proper expert witness to testify as to the standard of care applicable to Smith as a certified nursing assistant in effecting a transfer of a patient such as Hill and as to whether Smith met that standard in this case. Therefore, the trial court’s judgment as a matter of law in favor of Fairfield cannot be sustained on the basis of the defendants’ argument to the contrary on this issue.

B. Hill’s Expert Testimony Concerning Causation

As we indicated above, Hill not only had to present substantial evidence of a breach of the applicable standard of care, but also had to present substantial evi *405 dence that that breach “probably caused the injury ... in question.” § 6-5-549, Ala. Code 1975. Contrary to the defendants’ position that the trial court’s judgment should be upheld based on a failure of proof as to the latter issue, Hill contends that she presented sufficient evidence of causation, including the deposition testimony of Dr. David Volgas, a board-certified orthopedic surgeon who treated Hill following her injury.
Specifically, in response to the defendants’ contention that Hill’s broken leg could have been caused by her osteoporosis, Dr. Volgas testified as follows:
“A. The ... question specifically is could this fracture have occurred prior to her losing her balance or falling at the nursing home. And the answer is — is it possible? Yes. Is it likely? No, because of the fracture pattern and because of where the fracture is. Most people with a, what’s called stress fracture, which is simply patients with weak bone or whose activity level has increased beyond what the bone can bear, will develop stress fractures. And it’s very much akin to if you take a metal coat hanger and start bending it back and forth, you’ll notice little bitty cracks in it before it breaks [in two]. A stress fracture is simply the bone being stressed beyond what it can bear. And it usually— well, it always forms a transverse fracture. In other words, the bone is here, the fracture is straight across this way (indicating).
“Q. [Hill’s counsel:] Uh-huh.
“A. And they normally, in the leg, occur in the tibia, in the calcaneous or the hip.
“Q. Uh-huh.
“A. Hers occurred in the knee, which is atypical for that — for that mechanism. The fracture pattern that she has, which is one that sort of spirals around, is much more consistent with a twisting injury, is how you get those.
“Q. Okay. So that would indicate some acute occurrence?
“A. Yes.
“Q. So as you sit here, to a reasonable degree of medical probability, it would be your opinion that the injury was caused by some acute incident, like the fall she suffered?

“A. Yes.”

(Emphasis added.) Additionally, Dr. Vol-gas testified as follows with regard to Hill’s injury:
“Q. [Hill’s counsel:] And I’m almost done, Doctor, but do you have an opinion, to a reasonable degree of medical probability, about what caused the tibia fibula fracture to Ms. Hill based on the history provided?
“[Defendants’ counsel]: Object to the form of the question. Go ahead.
“A. [Dr. Volgas:] The history that was given to us was that she fell and sustained a fracture based on that. The fracture pattern is very much consistent with that story.
“Q. [Hill’s counsel:] Thank you, Doctor. Do you have an opinion, to a reasonable degree of medical probability, that — that this injury is the cause of the pain she was complaining about during your treatment—
“[Defendants’ counsel]: Object to the form.
“Q. [Hill’s counsel:] — to her leg?
*406 “[Defendants’ counsel]: Oh, I’m sorry, Barry. Object to the form of the question.
“A. [Dr. Volgas:] Is the pain related to that fracture? Is that what you’re talking about?
“Q. Yes.
“A. Yes, it is.”
(Emphasis added.)
The defendants argued to the trial court and reiterate on áppeal that “Dr. Volgas’ testimony to the effect that this injury was ‘consistent with’ certain facts or probably occurred from some incident ‘like’ a fall, is insufficient.” Defendants’ brief, pp. 57-58. They note that this Court has stated that “[t]here must be more than the mere possibility that the negligence complained of caused the injury.” Parker v. Collins, 605 So.2d 824, 826 (Ala.1992). More specifically, the defendants fault Hill for failing to ask Dr. Volgas if “this fracture 'probably resulted from this fall.” Defendants’ brief, p. 58.
The defendants’ position ignores the context in which Dr. Volgas testified. There is no evidence or indication in the record in this case that Hill had suffered any “acute incident” or “fall” other than the fall at issue. During the trial, Fair-field did not suggest that a different “fall” could have caused the injury; instead, Fairfield suggested that Hill’s “weak bones” resulting from osteoporosis caused the injury, a suggestion Dr. Volgas expressly refuted in his testimony. Moreover, Hill herself testified, and it was undisputed, that she suffered the fall in question, that she immediately felt pain in her leg, and that she was then promptly transported to the hospital, whereupon she was diagnosed with and treated for a broken leg. Against this backdrop, Dr. Vol-gas’s testimony was more than sufficient to allow reasonable jurors to infer that the fall probably caused the break to Hill’s leg.
The standard for proving causation in a medical-malpractice action is not proof that the complained-of act or omission was the certain cause of the plaintiffs injury. Instead, as this Court has frequently reiterated, the standard is one of the “probable” cause: “ ‘ “ ‘There must be more than the mere possibility that the negligence complained of caused the injury; rather, there must be evidence that the negligence complained of probably caused the injury.’ ” ’ ” Lyons v. Vaughan Reg’l Med. Ctr., LLC, 23 So.3d 23, 27-28 (Ala.2009) (quoting Sorrell v. King, 946 So.2d 854, 862 (Ala.2006), quoting in turn DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217 (Ala.2003), quoting in turn Parker v. Collins, 605 So.2d 824, 826 (Ala.1992) (emphasis omitted)). That test is met here. See also Giles v. Brookwood Health Servs., Inc., 5 So.3d 533, 550 (Ala. 2008) (“ ‘We are to view the [expert] testimony as a whole, and, so ■viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove.’ ” (quoting Hines v. Armbrester, 477 So.2d 302, 304 (Ala.1985))).
Based on the foregoing, the trial court’s judgment as a matter of law in favor of Fairfield based on an insufficiency of evidence from which reasonable jurors could find causation was inappropriate.

C. Summary Judgment on Piercing the Corporate Veil

Hill argues on appeal that a summary judgment in favor of Denz, Bennett, DTD, D & N, Aurora Healthcare, and Tara Cares was inappropriate. She contends that the evidentiary submissions to the trial court in response to the defendants’ motion for a summary judgment were, at the least, sufficient to create a *407 genuine issue of material fact as to whether the defendants constitute a single business enterprise and whether Fairfield is merely an “alter ego.” We agree.
“ ‘The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to subserve the ends of justice. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical.’ ”
Cohen v. Williams, 294 Ala. 417, 420, 318 So.2d 279, 280-81 (1975) (quoting 18 Am. Jur.2d Corporations § 14, p. 559). Although limiting the liability of the owner or operator of a business is a recognized and acceptable purpose for forming a separate legal entity, that separate entity “ ‘will [be] disregarded] when it is used solely to avoid personal liability of the owner while reserving to the owner the benefits gained through use of the corporate name.’ ” Bon Secour Fisheries, Inc. v. Barrentine, 408 So.2d 490, 491 (Ala.1981) (quoting Woods v. Commercial Contractors, Inc., 384 So.2d 1076, 1079 (Ala.1980)).
“In Alabama, as elsewhere, it is basic that a corporation is a distinct and separate entity from the individuals who compose it as stockholders or who manage it as directors or officers. Loper v. Gill, 282 Ala. 614, 213 So.2d 674 (1968). This is not a rule cast in concrete but rather this court has always looked to substance over form. In a proper case, when the corporate form is being used to evade personal responsibility this court has not been hesitant to disregard the corporate form and impose liability on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality. C.E. Development Co. v. Kitchens, 288 Ala. 660, 264 So.2d 510 (1972) and cases cited therein.
“... The decision is one made as an evidentiary matter on a case to case basis.... [S]ee Inadequate Capitalization As A Basis For Shareholder Liability: The California Approach And A Recommendation, 45 So. Calif. L. Rev. 823 (1972).
[[Image here]]
“This court pointed out in C.E. Development Co., supra, by reference to other authorities, including Dixie Coal Min. & Mfg. Co. v. Williams, 221 Ala. 331, 128 So. 799 [ (1930) ], that actual fraud is not necessarily a predicate for discarding the theory of separate corporate existence. It may also be discarded to prevent injustice or inequitable consequences .... [S]ee Fletcher, Cyc. Carp. (Perm. Ed.) Vol. 1, 1974 Revised Volume, § 41.2, p. 179.”
Cohen, 294 Ala. at 420-21, 318 So.2d at 281.
“A court may ‘pierce the corporate veil’ and declare a stockholder or officer the corporation’s alter ego when evidence is present that the stockholder or officer used the corporate form to escape personal liability. Aloma Coat Corporation, Inc. v. Behr, 408 So.2d 496, 498 (Ala.1981). The law will not recognize the legal entity of a corporation in equity when the controlling shareholder or officer creates the corporation ‘to promote injustice and protect the owner from payment of just obligations.’ Tri-State Building Corporation v. Moore-Handley, Inc., 333 So.2d 840, 841 (Ala.Civ.App.1976).”
*408 McKissick v. Auto-Owners Ins. Co., 429 So.2d 1030, 1033 (Ala.1983).
More specifically, this Court has observed that
“a separate legal existence will not be recognized when a corporation is ‘so organized and controlled and its business conducted in such a manner as to make it merely an instrumentality of another,’ Forest Hill Corp. v. Latter & Blum, 249 Ala. 23, 28, 29 So.2d 298, 302 (1947), or when it is the ‘alter ego’ of the person owning and controlling it. Whether the separate legal entity of a corporation may be ‘pierced’ and personal liability imposed is ‘a question of fact treated as an evidentiary matter to be determined on a case by case basis.’ Messiclc v. Moving, 514 So.2d 892, 893 (Ala.1987); accord Deupree v. Ruffmo, 505 So.2d 1218 (Ala.1987).”[8]
Ex parte AmSouth Bank of Alabama, 669 So.2d 154,156 (Ala.1995).
Likewise, in Duff v. Southern Ry., 496 So.2d 760, 762 (Ala.1986), the Court stated:
“This Court has said that a parent corporation which owns all the stock of a subsidiary corporation is not liable for acts of its subsidiary corporation, unless the parent corporation so controls the operation of the subsidiary corporation as to make it a mere adjunct, instrumentality, or alter ego of the parent corporation. Baker v. Hospital Corporation of America, 432 So.2d 1281 (Ala.1983).”
The Duff Court recognized the following indicia of control:
“ ‘(a) The parent corporation owns all or most of the capital stock of the subsidiary.
“ ‘(b) The parent and subsidiary corporations have common directors or officers.
“ ‘(c) The parent corporation finances the subsidiary.
“ ‘(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.
“ ‘(e) The subsidiary has grossly inadequate capital.
“ ‘(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.
“‘(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.
“ ‘(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation’s own.
“ ‘(i) The parent corporation uses the property of the subsidiary as its own.
“ ‘(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation ....
“ ‘(k) The formal legal requirements of the subsidiary are not observed.’
“Taylor v. Standard Gas & Electric Co., 96 F.2d 693, 704-05 (10th Cir.1938); see also Baker v. Raymond Int’l, Inc., 656 *409 F.2d 173 (5th Cir.1981); Garrett v. Southern Ry., 173 F.Supp. 915 (E.D.Tenn.1959).”
496 So.2d at 762-63. The Court further explained that “no one of these factors is dispositive; nor does the list exhaust the relevant factors.” 496 So.2d at 763. The Court noted that only 4 or 5 of the listed factors were present in Duff, combined with other evidence of control, while also taking note of a case in which only 2 of the 11 listed indicia were present. Id. (citing Garrett v. Southern Ry., 173 F.Supp. 915 (EJD.Tenn.1959)).
In the present case, Hill provided to the trial court an extensive evidentiary submission in response to the defendants’ motion for a summary judgment on the issue of piercing the corporate veil. When the evidence is viewed in the light most favorable to Hill, as it must be, there was evidence from which the trial court reasonably could have found all the following facts, most of which are in fact conceded by Fairfield:
1. Fairfield Nursing Home is a 190-bed skilled-nursing facility located in Fairfield.
2. Fairfield owns no real property and no significant personal property.
3. Fairfield carries only $25,000 in liability insurance.
4. Fairfield’s balance sheet for the most recent year showed a loss of $579,851.
5. Donald T. Denz is the sole member of DTD, LLC. Similarly, Norbert A. Bennett is the sole member of D & N, LLC.
6. Neither DTD nor D & N has any employees or an operating agreement.
7. DTD and D & N are the sole owners and members of Fairfield, each having a 50 percent interest.
8. Denz originally served as president and chief financial officer of Fairfield; Bennett originally served as chairman of the board and chief executive officer of Fairfield.
9. Fairfield, DTD, and D & N were created as LLCs within a few days of one another in May 2003. Tara Cares also was created in May 2003.
10. DTD and D & N are the sole owners and members of Tara Cares, each with a 50 percent interest.
11. Denz and Bennett are currently co-chief executive officers of Tara Cares. Tara Cares has no operating agreement.
12. Tara Cares owns no real or personal property.
13. Tara Cares has entered into a long-term “administrative services agreement” with Fairfield and at least 30 other affiliated nursing homes, as discussed below.
14. In addition to' Fairfield, DTD and D & N also own at least 30 other LLCs operating nursing homes in Alabama, Missouri, Illinois, Tennessee, Louisiana, Mississippi, and Georgia. DTD and D & N are the sole owners and members of each of these other nursing-home LLCs, each holding a 50% interest in each of them.
15. Like Fairfield, none of the above-described nursing-home LLCs own any real property or significant personal property.
16. The real property and most of the personal property at the nursing homes affiliated with the above-described nursing-home LLCs are owned by another entity called “Healthcare REIT.” In 2003, Denz and Bennett arranged for Healthcare REIT to purchase all of this real and personal property from Beverly Healthcare for the purpose of leasing it to Aurora Healthcare, LLC.
*410 17. Aurora Healthcare’s sole purpose is to serve as the “middleman” in the leasing of the real and personal property used at the nursing homes operated by these various LLCs. That is, Aurora Healthcare leases all of this real and personal property from Healthcare REIT and then subleases it to Fairfield and the other nursing homes described above.
Hill contends that nearly all 11 factors referenced in Duff were established by what Hill refers to as an “extensive and comprehensive summary judgment submission to the trial court”:
“First, it is undisputed that D & N and DTD own all of the thirty-plus nursing-home-LLCs, Tara Cares, and Aurora Healthcare. Second, all of these entities not only have common officers and duties, the same people sit on all of the nursing home governing bodies. Third, ... the contract [by which Tara Cares manages the nursing homes] allows the nursing-home-LLCs to not pay Tara Cares if they do not have the funds.... Fourth, Denz and Bennett and their LLCs (D & N and DTD) created all of these entities. Fifth, Fairfield’s $500,000.00 loss last year shows that it is undercapitalized. Sixth, Tara Cares not only pays the salaries and expenses of the nursing-home-LLCs, it actually controls their finances and their bank accounts. ... Seventh, the officers and administrators of the nursing-home-LLCS definitely do not act independently....[9] Finally, and perhaps most important, it is clear from all the evidence before the trial court that all the corporate defendants are controlled, and operate, as a single business enterprise.”
Hill’s brief, pp. 58-59.
Hill also introduced into evidence in the trial court the “administrative services agreement” between Tara Cares and Fair-field, which, according to Hill, demonstrates the degree of control Tara Cares actually exercised over Fairfield. The agreement indicates that Tara Cares: “propose[s] the standards, policies, and procedures” concerning the operation of Fairfield Nursing Home that are approved by the facility; performs the bookkeeping, ledgering, and accounting for Fairfield, including preparing all tax returns; performs “accounts receivable services and ... otherwise assist[s] [Fairfield] in the issuance of bills and in the collection of accounts and monies owed for goods and services furnished by [Fairfield]”; proposes the annual operating budget for approval by Fairfield’s executive director,[10] a document that is also reviewed by Denz and Bennett; prepares advertising and publicity materials for Fairfield; “provide[s] Medicare and Medicaid cost reporting and rate setting services”; “assist[s]” Fairfield in maintaining licenses and qualifications for all regulatory authorities; “advise[s]” Fairfield on the purchase of supplies and equipment, which, according to Fairfield employee Cynthia Southall, actually means that Fairfield must get approval from the Tara Cares Buffalo, New York, office for all equipment purchases; arranges for and maintains hazard insurance for Fairfield’s facility and equipment; “perform[s] payroll services and ... establishes] salary *411 levels, personnel policies and employee benefits [as well as] employee performance standards as needed ... to ensure the efficient operation of all departments within and services offered by [Fairfield]”; “prepare[s] and provide[s] to [Fairfield] “any reasonable operational information[11] which may from time to time be specifically requested by [Fairfield]”; “through its legal counsel, coordinate^] all legal matters and proceedings with [Fairfield’s] counsel”; and maintains checking accounts in Fairfield’s name on which Tara Cares is the cosigner from which are paid “[a]ll expenses incurred in the operation of [Fairfield],” and from which withdrawals and payments “shall be made only on checks signed by a person or persons designated by Tara [Cares].”
As noted, the question of piercing the corporate veil is “a question of fact ... to be determined on a case by case basis.” Messick, 514 So.2d at 893. Based on the foregoing, we cannot help but conclude that there exists a genuine issue of material fact as to whether the defendants operated as a single business enterprise as to which Fairfield was an alter ego. The matter being one of equity, Heisz v. Galt Indus., Inc., 93 So.3d 918, 929 (Ala.2012), the courts should not “allow a corporate entity to successfully masquerade through [its corporate affiliates] so as to defeat the payment of its just obligations.” Forest Hill Corp. v. Latter & Blum, Inc., 249 Ala. 23, 28, 29 So.2d 298, 302 (1947). Accordingly, the trial court erred in entering a summary judgment in favor of the defendants other than Fair-field with respect to Hill’s claim that, based upon the theory of “piercing” the “corporate veil,” they should be responsible for any “just obligations” for which Fairfield ultimately is found responsible.[12]

TV. Conclusion

Hill presented substantial evidence, including the testimony of registered nurse Toya Nelson and Dr. David Volgas, that she suffered a broken leg on May 10, 2006, and that this injury was caused by a breach of the applicable standard of care. Consequently, the trial court erred in entering a judgment as a matter of law in favor of Fairfield, and that judgment is due to be reversed. Hill also presented substantial evidence in support of piercing the “corporate veil” separating Fairfield and the other defendants; thus, the summary judgment in favor of those other defendants is also due to be reversed. The cause is remanded for further proceedings consistent with this opinion.
APPLICATION OVERRULED; OPINION OF OCTOBER 19, 2012, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
MOORE, C.J., and BOLIN, PARKER, SHAW, MAIN, and WISE, JJ., concur.
MURDOCK, J., concurs specially.
STUART, J., dissents.

. The complaint also listed Hill’s son, Fred Hill, as a plaintiff in the capacity of "next of friend” of Myrtis Hill, but Fred Hill later was dismissed as a plaintiff after the parties stipulated that Myrtis Hill was competent.

. In addition to the defendants listed, Hill at one point asserted claims against several other individuals and one limited liability company, LKC, LLC, not listed. At a hearing on a summary-judgment motion before trial, Hill voluntarily dismissed those other defendants.

. In their brief to this Court, the defendants raise a fourth issue, challenging the trial court's decision to allow this case to be tried based on an amended complaint filed 61 days before the eventual trial of this case, i.e., less than the 90 days for amending a complaint contemplated by Ala.Code 1975, § 6-5-551. Based on the holding of this Court in Baptist Medical Center Montclair v. Wilson, 618 So.2d 1335 (Ala.1993), a case we have not been asked to revisit, and given the unique procedural history of this case, we find no cognizable error in the trial court's decision to allow the trial in this case to proceed based on the amended complaint.

. In its brief on rehearing, Fairfield complains that Hill's “briefing to this Court” on original submission did not cite the reporter’s transcript for the above-quoted summary of Nelson’s testimony. Indeed, Hill does not cite the reporter's transcript for this summary, but instead cites various pages in the deposition testimony given by Nelson. Be that as it may, the quoted passage is a fair summary of what Nelson also testified to at trial. Moreover, in its brief on original submission, Fairfield did not complain as it does now about the fact that Hill failed to cite the reporter’s transcript for this summaty of Nelson’s testimony. See, e.g., Water Works & Sewer Bd. of Selma v. Randolph, 833 So.2d 604, 608 (Ala.2002) (opinion on rehearing) (citing Ex parte Lovejoy, 790 So.2d 933, 938-39 (Ala.2000), and the cases surveyed therein for ”[t]he well-settled rule of this Court [that] precludes consideration of arguments made for the first time on rehearing”).

. Other than the fact that she was not a physical therapist, we do not have before us any question regarding whether Nelson was qualified to provide expert testimony as to the standard of care applicable in this case.

. This colloquy is sufficient response to the suggestion in the dissent that Nelson did not testify that the standard of care applicable to nurses was applicable in this case. In any event, as the precedents discussed hereinafter in this Part III.A. explain, the applicability of the standard of care for nurses is not dependent upon such testimony.

. The law, not the institutional medical provider, sets the standard of care for a given service based on the nature of that service and who is providing it. To allow an institutional medical provider to choose which department within its corporate structure will set the standard for an activity and then limit itself and its employees to the standard so chosen would obviate the foregoing principle while doing substantial damage to the principle of respondeat superior. It would effectively allow an institutional medical provider to avoid duties that would otherwise be imposed on it by law as to the provision of medical services within a given discipline.

. See also R. Thigpen, Alabama Corporation Law § 8:3 (3d ed.2003) (explaining that our courts do not appear to have established a consistent line analytically between those circumstances when a corporation is said to be an "alter ego” as opposed to an "instrumentality”); id. at § 8:7 (discussing "brother-sister corporations and the theory of ‘enterprise entity' ”).

. In addition to the details of the "administrative services agreement” between Tara Cares and Fairfield discussed below, we note that the record indicates that the executive director of Fairfield Nursing Home is hired by and reports to Fairfield’s vice presidents, Chuck Brown and Chuck Sinclair, who are Tara Cares employees in addition to officers of Fairfield.

. Chance Becnel, former vice president of Fairfield and president and chief executive officer of Tara Cares at the time of this action, gave testimony disputing this point.

. Denz testified that "operational information” refers to financial information such as "a listing of expenses in a general ledger.”

. Hill incorrectly states that this issue is a matter for determination by a jury. "Whether the corporate veil of a business entity should be pierced is a matter of equity, properly decided by a judge after a jury has resolved the accompanying legal issues.” Heisz v. Galt Indus., Inc., 93 So.3d at 929.